Warren v. Pim.

---

LYMAN E. WARREN et al., complainants and respondents,

*v.*

J. HAROLD PIM et al., defendants and appellants.

[Argued December 7th, 1903.    Decided November 21st, 1904.
Filed November 30th, 1904.]

1. The "voting trust" in the stock of "The Fisheries Company," a New Jersey corporation, claimed by or on behalf of the "Pim committee" and "The Association of Foreign Shareholders of the Fisheries Company, Limited," a corporation of Great Britain, or either of them, is contrary to the public policy of this state, inoperative, null and void.    (By the court.)

2. An irrevocable "voting trust," or any other irrevocable grant (uncoupled with an interest in the stock to be voted upon) assuming to confer upon the donee the power to vote at stockholders' meetings for the choice of directors, is contrary to the letter, and also to the spirit and policy of the General Corporation act of New Jersey.    *P. L. of 1896 p. 277.* (PITNEY, J.)

3. The equality of each share of corporate stock in the eye of the law is an established principle in this state. (GREEN, J.)

4. The validity of a voting trust in this state is subject to at least two limitations, to wit, (a) that the holders of all of the shares of the corporation shall have an equal privilege (after fair information) of availing themselves of the trust agreement, and (b) that the object and aim of the trust shall be the equal benefit of all the shares. (GREEN, J.)

5. The voting trust under consideration ignores or defies the two limitations (a) and (b), and also ignores or defies the statutory policy of the equality of every share in the eye of the law; hence it cannot stand. (GREEN, J.)

On appeal from a decree of the court of chancery advised by Vice-Chancellor Pitney, whose opinion is reported in *20 Dick. Ch. Rep. 36.*

*Mr. Richard V. Lindabury* and *Mr. William I. Lewis,* for the appellants.

*Mr. William H. Corbin,* for the respondents.

DIXON, J.

The bill of complaint in this cause was filed in January, 1903, by Lyman E. Warren against the Fisheries Company, a corporation of this state, I. Harold Pim, Langley Archer West and Montgomery Horne-Payne, constituting what is called the "Pim committee," and the Association of Foreign Shareholders of the Fisheries Company of New Jersey, Limited, a corporation of Great Britain. Subsequently Nathaniel B. Church, Adolph Hirsh, James E. Heller, the American Net and Twine Company, William B. M. Chase and John Shepard were admitted as complainants in the suit.

The objects of the bill are—*first,* to compel a transfer to the complainants, upon the books of the Fisheries Company, of certain shares of stock in that company, now standing on its books in the names of the Pim committee, but claimed by the complainants as their property; *second,* to restrain the Fisheries Company from holding any election of directors until such transfer shall have been made; and, *third,* to have it decreed

that a certain "voting trust," under which the Pim committee and the British association claim some control over shares of stock in the Fisheries Company, is against public policy, fraudulent, inoperative, null and void. The bill was accompanied by affidavits and exhibits.

The members of the Pim committee and the British association filed an answer, which was also accompanied by affidavits and exhibits.

The Fisheries Company filed a separate answer, adopting substantially the views of the complainants.

The bill and the answer of the Pim committee and the British association disclose the ground of litigation.

The cause being submitted on bill and answers, the chancellor, on November 10th, 1903, made final decree in conformity with the prayer of the bill, and from that decree the appeal now to be decided was taken.

It appears that when the Fisheries Company was organized on May 25th, 1900, a majority of the shares of its stock was taken by persons residing in Great Britain and Ireland, and in order that a combination called a "voting trust" might be formed, enabling some representative of these shareholders to control the Fisheries Company, the British association was incorporated. As a preliminary to the formation of the "voting trust" most of the shares of these foreign holders, being a majority of the stock of the Fisheries Company, were transferred to the Pim committee. Afterwards, on November 12th, 1900, a deed poll was executed by that committee and the British association, which recites the authority of the Pim committee to create a "voting trust" of the shares of the Fisheries Company, and that the British association is the proposed "voting trust," and then, to complete the constitution of the trust, declares as follows:

"The said shares in the Fisheries Company now held by the said I. H. Pim, L. A. West and R. M. Horne-Payne * * * shall be held by the association with all rights and powers against third persons as if it were the absolute owner and holder thereof, but as between the association and the owners of the deposited shares the certificates of the association issued to such owners shall carry all rights and benefits except that of voting, subject, nevertheless, to the provisions hereof. * * * The association

will recognize the registered owner of any deposited share as the absolute equitable owner thereof subject to these presents. * * * The deposited shares shall be held by the association upon trust that they may and shall, according to the best of their discretion, do the things following, that is to say : Exercise all voting rights incident to the ownership of shares as and when the association shall think it expedient to exercise the same ; receive all dividends and bonuses and other moneys receivable in respect of the deposited shares ; raise or borrow on the security of the deposited shares any money required for the purposes of the execution of the trust ; take all such action and proceedings as they think expedient from time to time to protect the interests of the owners of the deposited shares. Dividends received * * * shall be paid over to the respective owners of the deposited shares, but the association may retain * * * any sum which the association may deem it advisable to set aside to meet contingencies and anything due * * * for expenses. * * * The trust shall be closed * * * when and so soon as the association shall by deed declare that it is to be closed, or when the owners of three-fourths of the deposited shares of each class by notice in writing to the association declare the trust to be closed, or when the last survivor of the now existing descendants of Her Majesty shall have been dead for twenty years, or when fifty years from the execution hereof shall have elapsed."

These excerpts denote the character of the voting trust now in question, and, it may be added, the corporate powers of the association are such as would enable it to execute the trust, but the owners of the deposited stock, as such, have no voice in its management.

It is admitted by the defendants that all of the shares claimed by the complainants really belong to them, but the defendants insist that some of those shares were by consent of the present or former owners subjected to the provisions of this deed poll, while the complainants contend that, although these shares were deposited with the Pim committee for the purpose of forming some voting trust, one having the qualities specified in the deed poll was not contemplated. This disputed question of fact would not dispose of the whole case and need not be considered until it is decided whether, even if consented to by the stockholder, such a scheme would be binding upon him or supportable against other stockholders.

The provisions of the deed poll above recited make it plain that the only claim which the Pim committee and the British association can make to the stock is the power of voting upon it and the right to defray out of the dividends the expenses incident

to the protection and exercise of that power. If the power to vote be denied, no reason is suggested for their retention of any connection with the stock. The object of the deed poll is to lodge the voting power thus separated from the ownership of the stock in the British association; and the question is therefore fairly presented whether such a foreign corporation can lawfully exercise that power upon the stock of a New Jersey corporation which it does not own.

The underlying judicial doctrine pertinent to the solution of this question was declared by our supreme court in *Taylor* v. *Griswold, 2 Gr. 222.* In that case the petitioner sought to set aside, under the act of December 8th, 1825 (*P. L. of 1825 p. 81*), an election held by the stockholders of a bridge company, organized in 1797 (*Laws of 1797 p. 201*), because the tellers had refused to receive votes tendered by proxy. The petition was denied, on the ground that the common law required all votes to be given in person, and that the duty of the corporators to attend in person for the purpose of exercising the franchise is implied in and forms part of the fundamental constitution of every charter in which the contrary is not expressed. This decision was affirmed by the court of appeals on February 24th, 1835, and since that time has been deemed settled law concerning the corporations of this state.

Primarily, therefore, the voting power of corporate stock must be considered the personal privilege of the stockholder, not separable from ownership of the stock except as such separation is sanctioned by the legislature.

In 1841 the legislature authorized stockholders in all incorporated companies whose charters did not otherwise provide, to vote by proxy at the election of directors, if the vote was tendered not more than three years after the date of the proxy. *P. L. of 1841 p. 116 § 2.*

In 1846 (*P. L. of 1846 p. 64*) it was enacted, with regard to manufacturing companies, that at all meetings of the company absent stockholders might vote by proxy, authorized in writing (*§ 11*); that every person holding stock in such company as executor, administrator, guardian or trustee, should

represent the stock in his hands at all meetings of the company and might vote accordingly as a stockholder; and that every person who should pledge his stock as collateral security might, nevertheless, represent the same at all meetings and vote as a stockholder (§§ 40, 41). These provisions were in 1849 (P. L. of 1849 p. 300 §§ 11, 37) extended to some other sorts of corporations.

In the revision of our Corporation acts, adopted April 7th, 1875, these enactments of 1841 and 1846 were made applicable to all companies organized under the laws of this state (Gen. Stat. p. 907 §§ 21, 38, 39), and they are also embraced in the Revision of 1896, with these additions, that persons holding stock in any other representative or fiduciary capacity than those above specified, may likewise represent the stock, and the person pledging his stock as collateral security may empower the pledgee to vote thereon. P. L. of 1896 p. 277 §§ 17, 37.

For many years past our statutes have required corporations to keep books in which the transfer of stocks should be registered, and have declared that at any election these books should be the only evidence as to who were the stockholders entitled to vote. But while the books are conclusive evidence for the officers conducting the election, they are only prima facie evidence when the right to vote is the subject of judicial investigation. Archer v. American Water Works Co., 5 Dick. Ch. Rep. 33.

In no respect, other than as above stated, has the legislature hitherto modified the general principle that the right to vote upon corporate stock is the peculiar privilege of the owner of the stock.

Although the language of the statutes above mentioned is capable of application to corporations as stockholders, it should not be so construed, because of another legal rule generally adopted in this country and now to be considered: The rule is that one corporation cannot become a stockholder in another corporation unless authority therefor is clearly granted by statute. Franklin Company v. Lewiston Savings Bank, 68 Me. 43; Franklin Bank v. Commercial Bank, 36 Ohio St. 350; Green Br. U. V. 91, note; Elkins v. Camden and Atlantic

*Railroad Co., 9 Stew. Eq. 5; Parsons v. Tacoma Company, 65 Pac. Rep. 765.* This doctrine presents two aspects: it brings into view both the law conferring power upon the corporation claiming to own the stock and also the law subjecting the stock to ownership. The latter aspect is that now chiefly to be regarded.

The first general statute of this state which expressly permitted the stock of a New Jersey corporation to be held by another corporation was section 55 of our revised act of 1875. Other acts of similar purport were passed April 17th, 1888 (*P. L. of 1888 p. 445*), and April 6th 1891 (*P. L. of 1891 p. 329*). They are now embodied in sections 49 and 50 of the Revision of 1896. Their scope is so narrow as to render it unnecessary to give them here further attention.

In 1893 (*P. L. of 1893 p. 301*) a more general act was passed, which made it lawful for any corporation created under the revised act of 1875 to purchase, hold and dispose of shares of the capital stock of any corporation created under the law of this or any other state, and to exercise, while owner of such stock, all the rights, powers and privileges, including the right to vote thereon, which natural persons being the owners of such stock might exercise. This is now section 51 of the Revision of 1896, except that the revisers dropped the reference to the act of 1875.

The bearing of this statute on the matter now in hand is, I think, very marked. In it, for the first time in our legislation, is the power of voting upon corporate stock expressly conferred upon corporations, and the limitations of the grant are very significant. These are threefold: *First.* The stock voted upon must be owned by the voting corporation; this excludes all interests less than or different from ownership. *Second.* The stock voted upon must be stock in a corporation created under the law of this or some other state, *i. e.,* some state of this Union. It has been suggested that "other state" may here include foreign countries, but that it does not is, I think, made manifest on noticing that in sections 6, 7, 95, 101, 254 and 255 of the statute, where foreign countries are intended, they are expressly mentioned in addition to "other states." *Third.* The voting

corporation must be a New Jersey corporation. Although the expression now is "any corporation," yet I think it must be thus confined, not only because it is a revision of acts in terms so limited, but also because, if it be not thus confined, it presents an absurdity by indicating that the legislature intended to authorize corporations, not created under our laws, to own and vote upon the stock of corporations not subject to our laws.

Keeping in mind the legal principles and statutes above mentioned, I come to the question to be decided in the present case— is it lawful for a corporation organized under the laws of a foreign country to vote upon the stock of a New Jersey corporation which it does not own? An affirmative answer is, I think, rationally impossible. On the doctrine established for this state by the case of *Taylor* v. *Griswold, ubi supra,* such an answer must be based on the clear intent of some statute, and no such statute can be found.

But it is said the policy indicated by our statute is such that on the principle of comity the courts must answer the question affirmatively, in order to concede to foreign corporations such privileges in domestic corporations as the legislature has designed that our corporations should enjoy in foreign corporations. In my view, the utmost demands of comity are inadequate for the end sought. The legislature has given its sanction to the exercise by New Jersey corporations of the right to own and (while owners) to vote upon the stock of corporations created by the laws of sister states. The corporations of a sister state, whose laws permitted the right thus sanctioned to be exercised, might invoke the doctrine of comity to support them in exercising a similar right in our corporations, but the claim could fairly go no further. That falls far short of the present exigency. The corporation to be favored comes, not from a sister state, but from a foreign country. It is not shown that the laws of that country would extend like favor to our corporations, and, even if they would, our corporations are not empowered to enjoy it; and the stock to be voted on is not owned by the corporation desiring to vote upon it, while ownership is made a condition essential to the exercise of the voting power by our own corporations, either within or without the state.

The question as to who shall exercise the voting power in our corporations is not one of mere private concern; it involves matters of public interest. Whether the laws of the state shall be faithfully observed in the management of these bodies depends, primarily, on the parties voting upon the stock. Even if, on principles of comity, such voting power should be conceded by the courts to corporations of sister states, which are subject to the federal constitution and laws and to state constitutions of which we take judicial cognizance, it would by no means follow that a like concession ought to be made to corporations organized under laws wholly unknown to us, and over which our courts, either federal or state, cannot acquire personal jurisdiction without their consent. A public policy having so wide a sweep ought, I think, to be supported by a clear expression of legislative purpose.

I therefore conclude that the British association cannot lawfully exercise the voting power which it was the design of the deed poll to confer upon it. Consequently, as the object of the proposed trust wholly fails, the complainants are entitled to have the stock which they own restored to them, whether the trust was concurred in or not, and also to enjoin the association from voting on stock belonging to other stockholders in the Fisheries Company.

The complainants are entitled to the same relief against the members of the Pim committee, but on different grounds.

The right of stockholders to place their stock in the hands of individual trustees and to have those trustees vote upon it is distinctly recognized in section 37 of our statute, and has been sustained in this court. *Chapman* v. *Bates, 16 Dick. Ch. Rep. 658.* Such a trust need not embrace all the stockholders of the company, and the questions that can be raised concerning it by stockholders not included in it are only those which relate to the propriety of the trust under the general rules of law and equity.

But in the present case no such trust was legally formed. The Pim committee was not empowered by any stockholder to be itself the holder of stock and to vote upon it; its authority was confined to the creation of a voting trust, not consisting of

the members of the committee alone. The purpose of the consenting stockholders must have been that such a trust should be constituted forthwith, and an attempt so to form it was made. That attempt is still persisted in, but now, after the lapse of four years, is finally determined to be futile. Changes, which during this interval have doubtless taken place in the ownership of so large an amount of stock, must, so far as they had reference to any voting-trust, have rested on the idea that the trust had been legally formed and the power of formation exhausted. It therefore cannot be reasonably presumed that the present owners have assented to the making of another attempt to form a voting trust, and without such assent they should not be subjected to the hazards of a new formation.

On these grounds, I think the complainants are entitled to the relief granted by the decree below. But my examination of the case has not led me to concur in that statement in the decree that the deed poll was "a fraud upon and unauthorized by the stockholders," and I therefore think it should be eliminated.

The following opinions were also delivered:

Garrison, J. (concurring in the decree).

Assuming that, upon principles of comity, the English "Association of Foreign Shareholders" would be accorded, in this state, the same voting right with respect to stock held by it in the New Jersey Fisheries Company—that our legislature has authorized a company incorporated in this state to exercise with respect to stock held by it in an English company—it is essential that the defendants bring their English company within the policy illustrated by our legislation concerning corporations of the same character. The pertinent inquiry is that touching the voting power of stock, the legal title to which is severed from its beneficial ownership, which severance, in the case of the English association, is complete. The furthest our legislation has gone with respect to general corporations in mitigation of the rule declared in *Taylor* v. *Griswold, 2 Gr. 222,* is to authorize a corporation, while owner of stock in any other corporation, to exercise all of the privileges of ownership, includ-

ing the right to vote thereon. *P. L. of 1896 p. 294 (Rev. § 51).* Assuming, but not deciding, that the ownership referred to in this legislation is that of the legal title to stock, the same statute provides that the business of every corporation so exercising such right must be managed by directors chosen periodically by its stockholders. *Rev. § 12.* This provision, in the case of a holding company, insures through the medium of the stock of such company a substantial relationship between the stock so held and its quondam owners or the assignees of their stock in such holding company. A foreign corporation, whose business, including the voting of stock the legal title to which is held by it, is managed by a representative elective body that is fairly the equivalent of our boards of directors, would, upon this assumption, be in a position to invoke the rule of comity in question. The English "Association of Foreign Shareholders" lacks the essential feature of having its business, including the voting of stock so held by it, managed by such an elective body. This places it outside of the policy recognized by this state with respect to its own holding companies, and hence necessarily outside the scope of the rule of comity referred to.

Upon this ground, which does not involve any case of the out-and-out ownership of stock, I rest my answer to each of the questions propounded by the court.

PITNEY, J.

I shall vote for an unqualified affirmance of the decree made by the court of chancery herein. The grave importance of the legal and equitable questions involved, and the fact that a majority of this court is not agreed upon the grounds of decision, justify an extended discussion of the case.

I agree with Mr. Justice Dixon that the plain object of the deed poll, and its necessary effect if it be valid, are to separate the voting power from the ownership of the stock covered thereby, and to lodge that power in the "trustees" named in the deed poll. By the terms of the deed, this arrangement continues for a term of fifty years, unless the "trustees" shall sooner

declare the trust to be closed, or unless the owners of three-fourths of the deposited shares of each class declare it to be closed. I do not think, however, that this situation necessarily, or even properly, presents the question whether a foreign corporation, as distinguished from a domestic one, can lawfully exercise such a power upon stock of a New Jersey corporation not owned by it. In my opinion such a power—a practically irrevocable voting power uncoupled with any ownership or interest in the stock itself—is obnoxious to the plain terms and spirit of our General Corporation act, and this equally whether the donee of the power be citizen or alien, domestic corporation or foreign. My reasons for this view will appear below. Being convinced that the deed poll furnishes no justification for the retention by the defendants of the stock owned by the complainants, nor any authority to vote upon it, because the so-called "voting trust" is invalid and contrary to the letter and policy of the statute, I am unwilling at this time to be committed to the view that the question is at all affected by the legal domicile of the trustees. The question raised upon their foreign domicile is at least debatable, yet it was not discussed at all in the arguments of counsel. From considerations of comity it ought not to be decided now, unless necessary to the determination of the case—nor, in any event, without hearing counsel. If called upon to commit myself upon the point, I should be inclined to dissent from the view expressed by Mr. Justice Dixon. He treats the "Association of Foreign Shareholders of the Fisheries Company of New Jersey, Limited," as a corporation, and such it doubtless is, in legal contemplation. But in truth and essence, as I shall show presently, the association is merely a group of individuals, with power to fill vacancies in their own number and thus maintain perpetual succession. In a court of equity, which disregards legal forms, they should be treated as individuals. I therefore do not concede the pertinency of the discussion respecting the doctrine that one corporation cannot become a stockholder in another corporation unless authority therefor is clearly granted by statute. Supposing it to be pertinent, I am inclined to the view that the doctrine relates solely to the powers, capacities and faculties of the "holding" company, and has no

other bearing upon the *status* of corporate stock as property. The authorities· cited by Justice Dixon so impress me. As I understand it, the doctrine is founded upon the plain proposition that when (for instance) a company incorporated to construct and operate a railroad proceeds to purchase stock in a hotel company, it in effect embarks a portion of its capital in the hotel business, and to that extent departs from the objects of its incorporation. Thereby it exceeds its powers as a railroad company. But the state, and dissenting stockholders of the railroad company, are the only parties concerned in this. A statutory authority expresses the consent of the state, and if the railroad company be incorporated in view of such a statute, that authority may be "read into" the contract of incorporation so as to bind corporators as assenting to the authorization. Such I understand to be the scope of the doctrine.

So it is expounded in Mr. Thompson's new work on *Corporation Law*. *1 Thomp. Corp.* §§ *1102, 1111; 2 Thomp. Corp.* §§ *2070, 2071; 4 Thomp. Corp.* §§ *4523, 5719.* At section 1108 he quotes the expression of Sir Nathaniel Lindley (now Lord Lindley) that

"there is no general principle of law which prevents a corporation from holding shares in a company, except the principle that a corporation cannot lawfully employ its funds for purposes not authorized by its constitution." *Lindley Comp. (5th ed.) 43.*

The successive statutes of this state, authorizing one company to hold stock in another, seem to relate solely to the powers of the holding company. The revised Corporation act of 1875 contained no such authorization. *Rev. 1877 pp. 175, 187 § 55.* Section 55 was amended in 1889 so as to give authority for this purpose in a limited class of cases. *P. L. of 1899 p. 412.* Other acts of limited scope are found in *P. L. of 1888 p. 445* and *P. L. of 1891 p. 329.* Acts of more general operation are in *P. L. of 1888 p. 385 and P. L. of 1893 p. 301.* The provisions of the revised Corporation act of 1896 that bear upon the question are found in sections 49, 50 and 51. *P. L. of 1896 pp. 293, 294.*

I find nothing in any of these enactments that has any direct bearing upon the transferability of shares of stock in corporations of this state. On the contrary, by section 20 of the act of 1896, such shares are declared to be personal property, transferable without express qualification as to the personality or domicile of the transferee. And I can find nothing in the act that satisfied me that any discrimination is intended to be made against aliens or foreign corporations, either as to their ownership of such stock or as to their right to vote upon it if they own it. Section 17 expressly authorizes absent stockholders to vote by proxy. Nor do I perceive any reason for denying to a foreign corporation or individual the right to vote upon stock not owned by it or him that does not equally apply to our citizens and residents.

This brings me to a consideration of the scheme attempted to be established by the deed poll, which, by its terms, confers irrevocably, for fifty years, the power of voting upon a majority of all the outstanding stock of the Fisheries Company and confers it upon parties who have no interest in the stock. Concededly the plan was adopted without consent of the minority stockholders, among whom are the complainants. Is the scheme lawful and valid?

In order to show the precise manner in which the question is presented, a review of the facts is important. There are several complainants, all of whom are large stockholders in the Fisheries Company, which is a corporation organized under our General Corporation act of 1896. The total capital stock of the company outstanding is $2,538,000, divided into shares of $100 each, of which twenty thousand shares are of preferred stock and the remainder common. The certificate of incorporation neither creates nor recognizes any discrimination respecting voting powers, either as between preferred and common stockholders, or as between American and British holders.

Three of the complainants (Chace, Shepard and the American Net and Twine Company) hold severally blocks of stock, aggregating seven hundred shares of preferred and one hundred and seventy-seven shares of common. These complainants have no

ownership in any of the stock that is claimed to be subject to the deed poll. The complainant Warren holds outright, in his own name, five hundred and forty-seven shares of preferred stock not subjected to the deed poll, and he also holds the equitable title (in trust, however, for Messrs. Church and Hirsh & Heller) to one thousand six hundred and thirty-two shares of preferred and three thousand seven hundred and twelve shares of common stock that he acquired by purchase from two several British stockholders, to wit, the Fish, Oil and Guano Company and one Hardman. I call this stock "British" simply to distinguish it from the other stock held by complainants. The complainants Church, Heller and Hirsh, besides their equity in this "British" stock, are severally the holders and unquestioned owners of stock aggregating two thousand six hundred and ninety-seven shares of preferred and three hundred and thirty-seven shares of common, in respect of which there has been no assent to the deed poll.

The legal title to the "British stock" of the complainants (one thousand six hundred and thirty-two shares of preferred and three thousand seven hundred and twelve of common) is held by the defendants Pim, West and Horne-Payne (known as the "Pim committee"). These defendants also hold the legal title to a large amount of other stock owned by residents of Great Britain and Ireland, sufficent in all (including the complainants' "British" stock) to make up a majority of the outstanding stock of the company. The Pim committee acquired this legal title at the organization of the Fisheries Company, in the year 1900, they being at the time empowered simply to represent the British stockholders in the reorganization of a former company, of which the Fisheries Company is the successor. The stock of the new company was placed in the names of the committee, primarily, for the purpose of facilitating the transfer of shares, and not for the formation of any voting trust. About the same time, however, the British stockholders gave express assent to the terms of a proposition, in writing, issued by the Pim committee, known as the circular of June 1st, 1900. That circular proposed a "voting trust," to include the shares of persons resident in the United Kingdom, in order to secure a "solid,

controlling vote" at the company's meetings. The purposes of that circular would have been fully satisfied by a temporary and revocable trust. Such a trust, in my view, would have amounted, in effect, to a mere proxy to vote upon the shares so long as deposited, and while, by the terms of the Corporation act, it would not have been permitted to continue longer than three years, it would not, I think, have been obnoxious to the statute, but would have been construed in subordination thereto; that is, it would have been revocable by any depositor and limited, at all events, to the term of three years. With no other express antecedent authority than this (at least so far as the shares now in question are concerned), the Pim committee, on or about November 12th, 1900, undertook to subject the stock standing in their names to the terms of the instrument known as the deed poll, embodying a practically irrevocable "voting trust," to continue for fifty years. The trustee named in the deed poll is a British corporation organized for the purpose, with the designation of the "Association of Foreign Shareholders in the Fisheries Company of New Jersey, Limited."

The "British" stock now owned by the complainants was purchased by them from stockholders who were *cestuis que trustent* of the Pim committee. The members of the Pim committee, and also the "association," are defendants and appellants in this cause. The Fisheries Company is a defendant, but not an appellant.

The main purpose of the bill of complaint was to secure the release of complainants' "British" stock from the operation of the deed poll, and to enjoin the defendants from exercising voting privileges with respect to it. The relief that is granted by the decree under review is limited to the stock thus acquired by the complainants by purchase from the Fish, Oil and Guano Company and from Hardman. The effect of the decree is to require the certificates for that stock to be delivered over to the complainants and transferred to their names on the books of the Fisheries Company, and to enjoin the defendants from exercising voting powers with respect to it. The decree, in short, dissolves the voting trust solely with respect to complainants' shares.

The "British" stock in question was assigned to the complainants in the year 1892. The written assignments express that it is transferred subject to the several conditions upon which it was held by the assignors. The defendants assert that it was held by the assignors subject to the terms of the deed poll. One reply made by the complainants to this insistment is that the Fish, Oil and Guano Company and Hardman, or either of them, had never in fact assented to become bound by the terms of the deed poll.

Upon this question of fact I agree with the complainants' contention, my views in this regard being in accord with those of Mr. Justice Swayze.

The further contention of the complainants is that the deed poll, even if assented to in fact, is void in law because contrary to public policy and a fraud upon the non-assenting stockholders. If the provisions of that instrument be contrary to the letter and spirit of our General Corporation act, under which the Fisheries Company was organized, and if it violates the substantial rights of the American stockholders who did not assent to it, it violates public policy in two respects—*first,* in contravening the statute itself; and *secondly,* because it amounts to an agreement to perpetrate a civil injury upon the non-assenting stockholders, and such an agreement is contrary to public policy. In either case the agreement should be treated as a nullity in this or any other legal or equitable proceeding. Non-assenting parties are manifestly entitled to relief against it. And assenting parties, or those claiming under them, are clearly under a duty to withdraw at the first opportunity from any agreement that violates the letter or policy of the law. The complainants, who are owners of "British stock," so far as they claim in right of such ownership, seek simply the full recovery of their property and the voting rights pertaining thereto, which certainly cannot be deemed to be forfeited by the supposed assent of previous owners to the unlawful agreement. They have no recourse in a court of law, since only an equitable tribunal can give the relief they seek. The only obstacle to such relief, under the circumstances, would be the acquiescence of their assignors to

24

the arrangement from whose consequences they seek to be relieved, coupled with evidence to show that the defendants had changed their position or incurred expense on the strength of it. Such an obstacle would operate merely to require those complainants who claim by assignment from assenting stockholders to make restitution to the defendants as a condition of the relief they pray for. But this case shows no ground for the imposition of such terms. No expense has been incurred by the defendants beyond such as may be recouped from funds in their hands. And no 'change of position, on the part of the defendants or others, has occurred, excepting only the mutual assent given by them to the terms of the deed poll. If the deed poll be itself an unlawful agreement, assent to it cannot, of course, be treated in a court of equity as an impediment in the way of giving equitable relief to those who assented, or to others claiming under them.

Moreover, some of the complainants hold (only) stock that has not been subjected to the deed poll, and whose present or former owners have never assented thereto. Those complainants, in my view, being of the very class of stockholders whose rights were directly and inevitably infringed by the operation of the deed poll, are entitled to relief against it, at least to the extent granted by the decree under review. And as to them there is no ground for the imposition of terms.

So much for the *status* of the parties.

The deed poll was in form executed only by the "Association of Foreign Shareholders," &c., and by the three members of the Pim committee. Appellants concede that in order to render it effective at all as an agreement the assent of the equitable owners of the stock that was held in legal title by the Pim committee was necessary. This is undoubtedly true. Upon the proofs the appellants claim that all such owners assented. This I assume to be true, for the purposes of the following discussion, and proceed to consider the validity of the arrangement.

The deed poll declares that the shares in the Fisheries Company held by the Pim committee, and any further shares in that company which shall be transferred to or vested in the association,

Warren *v.* Pim.

"shall be held by the association with all rights and powers against third persons as if it were the absolute owner and holder thereof, but as between the association and the owners of the deposited shares the certificates of the association issued to such owners shall carry all rights and benefits except that of voting, subject, nevertheless, to the provisions hereof. Any such vesting may, when the association thinks fit, be made by declaration of trust in favor of the association, and when the shares are so vested the association may allow the legal title to remain outstanding so long as the association thinks expedient."

It further declares that "the association will recognize the registered owner of any deposited share as the absolute equitable owner thereof, subject to these presents."

The purpose of the instrument is expressed as follows:

"The deposited shares shall be held by the association upon trust that they may and shall, according to the best of their discretion, do the things following, that is to say:

"(1) Exercise all voting rights incident to the ownership of shares as and when the association shall think it expedient to exercise the same.

"(2) Receive all dividends and bonuses and other moneys receivable in respect of the deposited shares.

"(3) Raise or borrow on the security of the deposited shares any money required for the purposes of the execution of the trust.

"(4) Take all such actions and proceedings as they think expedient from time to time to protect the interests of the deposited shares."

Other clauses vest in the association "absolute and uncontrolled discretion" as to the exercise of "all their trusts, powers, authorities and discretions," and "in the absence of fraud they shall in nowise be responsible for any loss, costs, damages or inconvenience that may result from the exercise or non-exercise thereof." They are authorized to delegate (with power to subdelegate) any of the trusts, powers and discretions vested in them, without responsibility for loss. They may "act on the opinion or advice of any lawyer, valuer, surveyor, broker, auctioneer or other expert, and shall not be responsible for any loss occasioned by so acting." They "shall not be responsible for acting on any advice or information purporting to be conveyed by any letter, telegram or cablegram, although the same shall contain some error or shall not be authentic." The association "shall not be responsible for the consequences of any mis-

take, or oversight, or error of judgment, or forgetfulness, or want of prudence on the part of the association, or any agent or other person appointed by them hereunder;" nor even "responsible for any·misconduct on the part of any agent or other person appointed by them, or bound to supervise the proceedings of any such appointee." And, again,

"The association, and every agent appointed by them hereunder, shall be entitled to be indemnified out of the trust premises in respect of all liabilities and expenses. incurred by them or him in the execution of the trusts hereof, or of any powers, authorities or discretions vested in them or him pursuant to these presents, including liabilities, consequent on any mistake, oversight, error of judgment, forgetfulness or want of prudence on the part of the association or any such appointee," &c.

, By the terms of the deed poll the trust is to continue for fifty years, unless the "association" declares it sooner closed, or unless the owners of three-fourths of the deposited shares of each class declare it to be closed.

The owners of deposited shares are not, as such, members of the "association." They have none of the ordinary voting rights, even for the purpose of controlling the action of the "association." They may, indeed, have a voice in filling vacancies occurring in the membership of the committee of the "association," but they cannot remove a member without the concurring vote of two-thirds of all the deposited shares of each class.

Let us see how this works out in practice. The twenty thousand shares of preferred stock of the Fisheries Company were held, nine thousand nine hundred and ninety-five shares by American stockholders and ten thousand and five shares by British stockholders. Of the five thousand three hundred and twenty-eight shares of common stock outstanding, four thousand eight hundred and three were held in England, five hundred and twenty-five in America, the remaining four thousand six hundred and seventy-two shares of authorized common stock being in the treasury of the company. Almost, but not quite, the entire fourteen thousand eight hundred and eight shares of British stock (including, of course, the "British" stock now

Warren v. Pim.

owned by complainants) and enough to constitute a clear ·majority of the Fisheries shares are subjected to the deed poll. The common stock was issued in the reorganization of the predecessor company upon payment of only $5 per share. Now, by the terms of the deed poll, the "trustees" therein named, with the co-operation of one-fourth of the "trusteed" common stock (one thousand two hundred and one shares, par value $120,100, cost in reorganization $6,005), may prevent the termination of the trust. And the owners of one-third of the "trusteed" common stock (one thousand six hundred and two shares, cost in reorganization $8,010) may prevent the removal of anyone of the seven trustees who comprise the association.

As will be seen above, the deed poll does not vest in the association any ownership of or interest in the deposited shares. As between the parties assenting thereto, there is not even a pretence of such ownership or interest. The deed frankly avows that the shares

"shall be held by the association with all rights and powers against third persons *as if it were* the absolute holder and owner thereof, but as between the association and the *owners* of the deposited shares, the certificates of the association issued to such *owners* shall carry *all rights and benefits except that of voting*, subject, nevertheless, to the provisions hereof. * * * The association will recognize the registered *owner* of any deposited share as the *absolute equitable owner thereof*, subject to these presents," &c.

In short, the purpose of the deed is to clothe the association with the bare legal title of the deposited shares, or with a declaration of trust from the Pim committee that carries to the association only the right to the bare legal title, for the sole purpose of enabling the association to exercise irrevocably the power of voting upon the deposited shares and to defray out of dividends the expenses incident to the protection and exercise of that power, leaving in the depositors the entire beneficial interest and substantial ownership of the shares deposited, uncoupled with any power to direct or control the votes that are to be cast at corporate meetings of the Fisheries Company in virtue 'of such ownership. The scheme, if valid, results in a complete

divorcement of the voting power from the ownership of the shares.

Nor is the true import of this arrangement at all varied by the circumstance that the trustees are empowered to collect dividends upon the deposited shares. With respect to such dividends they are a mere conduit between the Fisheries Company and the depositors, and have no more interest than a depositary of bonds, with authority to cut coupons and remit proceeds to the owner, has an interest in the bonds deposited. The power to retain from the dividends compensation for the trustees' services in the performance of the trust cannot create a substantial interest if the trust itself does not. The same may be said of the power to borrow on the security of the deposited shares any money required for the execution of the trust. The power to take actions and proceedings to protect the interests of the deposited shares is, of course, wholly speculative, no such action or proceeding being in contemplation. Moreover, a covenant by a property owner to forego the right to seek the courts of law or equity, upon a proper occasion arising in the future, would be plainly contrary to public policy, and I do not see how an agreement to confide to a third party, in advance, the uncontrolled discretion to decide whether an action at law or in equity shall be brought when occasion requires, can stand on any better footing. Certainly such an agreement cannot be said to pass any interest in the stock.

But above all, it is plain, beyond controversy, that the main end and object of the deed poll is to assign the voting power upon the deposited shares. Manifestly the other powers are secondary and were added only in order to carry out the main purpose. Upon the pleadings and proofs this is entirely undisputable. If the main purpose be illegal and contrary to public policy, the secondary powers must fall with it.

It seems to have been assumed upon the argument that the British stockholders, whose stock is deposited under the deed poll, are for that reason members of the "Association of Foreign Shareholders of the Fisheries Company of America, Limited." This is so far from the fact that in this respect the title of the

association is entirely misleading. It is a company of individuals, endowed with perpetual succession and having no capital stock. Its memorandum and articles of association are before us. From them it does not even appear that ownership of stock in the Fisheries Company is essential to membership in the association. The management of the business of the association is vested in a committee of seven, of whom the members of the Pim committee are three. These seven are to remain permanently in office until they severally resign, become bankrupt or lunatic, cease to be members of the association, are requested by two-thirds of the committee of the association to resign, or are removed by resolution of the owners of deposited shares of the Fisheries Company, held under the provisions of the deed poll. As already shown, such a resolution requires the concurrence of two-thirds of each class of deposited shares. The membership of the association is composed of the seven members of the committee and such others as they may from time to time admit. The committee may likewise terminate the membership of any member by resolution. Practically speaking, therefore, we may say that the seven members of the committee are at the same time the association.

If it be assumed that the ownership of deposited shares is necessary to qualify one for membership in the committee of the association, it is at the same time entirely obvious that the number of shares required to qualify would be nominal, bearing no relation whatever to the voting power in the meetings of the Fisheries Company that is assumed to be conferred by the deed poll. The present controversy does not relate to the shares that the members of the association or of its committee in truth own. For simplicity of expression, therefore, it is entirely proper to deal with the association as having no interest in the deposited shares beyond the voting power that is attempted to be conferred by the deed poll.

The owners of deposited shares have none of the ordinary voting rights in respect of controlling the action of the association or its committee. By the provisions of the scheme they lose not only their voting rights in the Fisheries Company, but all right to

control, by force of majorities or otherwise, the membership or proceedings of the association, which by the deed poll is constituted their trustee.

We thus have the voting power that normally pertains to shares of stock aggregating more than a majority of the outstanding capital of the Fisheries Company assigned for fifty years, practically without power of revocation, to a body of seven individuals and their successors, who are without property interest in the shares, and to whom is given absolute and uncontrolled discretion without any direct accountability even to their constituents, and without responsibility for incompetency, negligence or anything short of proven fraud, and with powers so ample that proof of fraud would be well nigh impossible.

In passing, it may be worth while to mention that the actual business of the Fisheries Company is conducted in the United States and upon the high seas adjacent to the American coast. It operates a large number of steam fishing vessels, and has numerous factories upon the coast, in which fish oil and guano are manufactured. There is nothing to show, I believe, that the members of the association have the least practical knowledge of or experience in this business. And they are all residents of Great Britain.

We are assured that the deed poll was prepared by eminent English solicitors under the advice of most eminent counsel. And it seems to be suggested, if not argued, that the purpose and effect of the instrument are to insure a consistent and conservative management of the Fisheries Company, in accordance with the views, primarily, of the British stockholders, but for the general benefit of all other stockholders as well. How such a purpose and effect can be seriously attributed to this masterpiece of professional ingenuity, which confides absolute and uncontrolled discretion to a group of inexperienced individuals who live remote from the scene of the company's activities, and whose personal stake in the success of the company is so insignificant that it may be disregarded entirely for practical purposes; which permits them to act, or not to act, as they choose; which permits them to delegate all their vast powers and dis-

cretions, and to authorize their delegates to sub-delegate the like powers and discretions; which permits them to act on the opinion or advice of anybody; which allows them, without responsibility, to act on what purports to be advice or information, conveyed by letter or the like, although the same be not authentic; which leaves them free from responsibility for their own mistakes, oversights, forgetfulness or want of prudence, and unhampered by any duty even to supervise the proceedings of their own appointees; and which entitles the trustees and their agents to indemnity out of the trust funds against the consequences of their own mistakes, oversights, forgetfulness and want of prudence, I confess I am at a loss to imagine.

It is, I think, decidedly a stretch of construction to call the association or its members "trustees" for the owners of deposited shares. The deed poll sets forth no definable duty that they owe to the depositors, beyond using, if and when they see fit, an uncontrolled discretion about voting at the meetings of the Fisheries Company. The duties and obligations of the trust must be found by implication, if at all. And I fail to see how any enforceable duty can be implied, in the face of the express, reiterated provisions of the deed poll exonerating the so-called "trustees" from the duties and obligations ordinarily incident to such an office.

If at the inception of the Fisheries Company the British stockholders had resolved among themselves, without consent of or even consultation with the American stockholders, that all meetings of stockholders for election of directors to manage the business of the company should be abandoned for fifty years, and that during that period the managers of the company's business should be chosen by seven persons who were not stockholders, or by the deputies or sub-deputies of the seven, with absolute non-accountability on the part of the seven and their deputies, the attempt to put such a plan into execution would be sufficiently startling. Yet that, in effect, is just what is attempted to be done by this extraordinary document known as the deed poll. Manifestly, under such an arrangement, the annual stockholders' meeting becomes the merest farce. The

actual choice of directors is not made by the stockholders, but by the seven. Presumably the directors chosen will be the seven themselves, or others who are entirely subservient to them. In either event, it requires no insight to discern that *the seven are the actual managers of the business of the company.* The significant thing about the arrangement is that not merely the holders of stock outside of the "trust"—representing nearly one-half of the entire capital invested in the company—are to have no voice in the management of its affairs, but that the majority interest—the depositing stockholders—are themselves disabled from interfering. It is to be hoped that the directors chosen by the seven would be held accountable in law for proved neglect of the concerns of the company, as well as for proven fraud therein; but when we reflect how easy it is to find "dummy" directors without financial means to make good their legal responsibilities, even this trifling safeguard vanishes. In truth, for all practical purposes, *the seven are themselves to be a permanent board of directors, without accountability.*

And we are told that this arrangement, so pregnant of disastrous consequences to the future of the Fisheries Company, so devoid of safeguards for the substantial interests of the stockholders—majority and minority as well—is strictly legal and equitable, and in accord with public policy, as manifested in the General Corporation act of New Jersey. Let us see.

I base my view that an irrevocable voting trust, or any other irrevocable grant (uncoupled with an interest), assuming to confer upon the donee the power to vote at corporate elections for the choice of directors, is unlawful and void—*first,* upon the plain letter of our General Corporation act (*P. L. of 1896 p. 277*), and *secondly,* upon the reason, spirit and manifest policy of the act.

And first as to the letter of the law. Section 12 of the act declares that the business of every corporation shall be managed by its *directors,* who are to be chosen *annually* by the *stockholders,* and shall hold office for one year and until others are chosen and qualified in their stead; but by so providing in its certificate of incorporation the directors may be classified in

respect to their terms of office, provided that no class shall be elected for a shorter period than one year or for a longer period than five years, and that the term of office of at least one class shall expire in each year.  Section 36 declares that, unless otherwise provided in the charter, certificate or by-laws of the corporation, at every election each stockholder, whether resident or non-resident, shall be entitled to one vote, in person or by proxy, for each share of the capital stock held by him, but no proxy shall be voted on after three years from its date.  And section 17 provides that absent stockholders may vote at all meetings by proxy, in writing.  From these express provisions it results, I think, according to the plainest principles of interpretation, that any other scheme of corporate management and any other kind or method of voting are impliedly excluded. *Expressio unius est exclusio alterius.*  When the act says that the directors and managers of the company shall be elected by the stockholders, it means that those who are not stockholders shall not participate in such election.  When it says that the directors shall be chosen annually, unless by unanimous consent expressed in the certificate of incorporation they be classified, in which case they may be elected for not longer than five years, but with the proviso that the terms of office of one class shall expire each year, it prohibits any scheme for placing managers in control of the business of the company who are without annual accountability to the stockholders.  When the act says that in electing directors each stockholder shall be entitled to one vote for each share of stock held by him, it means at the same time that a person holding only ten shares, or fifty shares, shall not have a voting power proportionate to one thousand shares, or five thousand shares.  When it says that absent stockholders may vote by proxy, it means that no substitute for an absent stockholder, other than his proxy, may be admitted to vote in his stead.  A proxy, *ex vi termini,* is revocable, unless it be coupled with an interest.  A proxy is presumably voicing the judgment and will of his principal.  An irrevocable assignment of the voting power, or, what amounts to the same thing, an act that irrevocably delegates the voting power to one who has

no interest in the stock, upon trust that he will vote according to his own judgment, discretion and will, is an attempt to constitute a substitute voter who is not actuated by any interest in the welfare of the company. The difference is fundamental.

As to the reason, spirit and policy of the act. The argument for the separation of the voting power from the property interest in the stock to be voted upon rests at bottom upon the erroneous notion that the stockholder's vote or right to vote is a chose in action, or a property right, separate and distinct from the property that is represented by the stock itself; just as if the voting privilege were a substantial fruit of stock ownership in the same sense that dividends are. But what is a vote? The *Century Dictionary* defines it as

"the formal expression of a will, preference, wish or choice in regard to any measure proposed, in which the person voting has an interest in common with others, either in electing a person to fill a certain situation or office, or in passing laws, rules, regulations," &c.

A vote, therefore, by the very definition, is but the formal expression of the will of those interested in the question to be voted upon. The right to vote is a privilege, a franchise, to be exercised in respect of the property right to which it is annexed. All the clauses of the Corporation act that touch upon the subject seem to me to show a plain purpose and policy that the management of the corporation is to be controlled by the self-interest of its proprietors, voiced at the annual stockholders' meetings, in the election of directors to manage the business. The whole of the act, and especially the provisions to the effect that any lawful business may be conducted by such a company, that the shares of capital stock shall represent money or money's worth equal to the par value of the shares, that the directors are to be elected by the stockholders and are themselves to be stockholders, that the executive officers are to be chosen either by the directors or stockholders, that the stockholders shall have one vote for each share of capital stock held by them, &c., are eloquent to the same effect. Without multiplying references, it is plain, from every section and line of the act, that the stock-

Warren v. Pim.

holder's vote has no other reason for existence except that the stockholders, who compose the company, who are in truth the company, whose capital is embarked in its enterprises, who are the proprietors of its assets and entitled to its gains and profits, are entitled at the same time, and for that reason and no other, to manage its concerns and business through the formal expression of their will, each in proportion to his interest, at the annual stockholders' meetings. The judgment of the parties interested, actuated by their interest and guided by the experience of the company from time to time and from year to year, is to dominate the management of the company; that judgment being ascertained by formal expression, according to the majority in interest for the time being, at yearly elections.

In searching for the reason and spirit of the act in this respect it is hardly necessary to say that where the act mentions "stockholders" as entitled to vote, I take it to mean *actual* stockholders—*real* stockholders—and not those who, from the fortuitous circumstance that they hold stock certificates without ownership of or interest in the stock itself, assume to vote in respect thereto.

It is true that, generally speaking, the provisions of the act make express reference only to the legal title of shares and deal with the rights of shareholders only as legal rights. This mode is usually adopted by law-making bodies. But legal rights created by statute, like those which arise from the rules of the common law, are always subject to the principles of equity. In the absence of anything to the contrary, a stock certificate, of course, evidences ownership of the entire title, legal and equitable, to the shares specified therein; but when a court of equity comes to consider the transaction it receives evidence to contradict the stock certificate and bases its decree upon the actual situation. Indeed, the courts of law do the same for all purposes properly within their jurisdiction. Thus, by section 19 of the act, every stockholder is entitled to a certificate of stock, but it is held that such a certificate is not necessary to constitute one a stockholder. It is but the statutory evidence of his right and is not conclusive upon the courts. *Downing* v. *Potts.*

*3 Zab. 66, 79; Storage Company* v. *Assessors, 27 Vr. 389, 393.*
Section 40 of the act declares that in case the right to vote upon
any share of stock shall be questioned, the inspectors of election,
in ascertaining who are the stockholders, shall be controlled by
the stock-book and transfer-book. But this is manifestly in-
tended as a limitation only upon the jurisdiction of the in-
spectors of election, whose determination is to be based on the
legal *status* as shown by the books. Although the inspectors
may not look behind the record, the courts may do so; and a
court of equity will take proper measures in advance to insure
that the election shall be participated in by those who are en-
titled to vote, and by them only. *Archer* v. *American Water
Works Co., 5 Dick. Ch. Rep. 33; 1 Thomp. Corp:* § *732; Mora-
wetz Corp.* § *219.*

And so, while the letter of the Corporation act contemplates
that the votes shall be cast by the legal owners of shares, this is
subject to the operation of the general principles of equity as
between stockholders and as between the true owner and the
nominal holder of shares. In the interest of orderly and simple
procedure at the stockholders' meeting, it may well be conceded
that all parties participating therein may be held conclusively
bound by the legal *status* of share ownership as disclosed by
the company's books at the time of the meeting, in the absence
of fraud, surprise or other special circumstances. But this rule
simply necessitates a timely appeal to the court of equity, in
advance of the meeting, by parties entitled to have the legal
*status* made to conform to the actual truth and equity of the
matter.

Any construction of the Corporation act that denies the power
or the duty of the court of chancery to look through forms and
disguises, and to base its decrees upon the actual, substantial
situation of stockholders, would violate the fundamental law,
for the constitution of 1844 establishes the court of chancery
as one of the courts that are indestructible by legislation, and
thus perpetuates the inherent jurisdiction that that court had
always previously exercised.

Upon the whole, it seems to me that the letter and spirit of

the Corporation act alike recognize the universal equitable principle that the rights and interests of the actual *bona fide* owners of the property are paramount, and also recognize the common-sense principle of business that the owners of the property should be entitled to control it, and to exclude from control those who have no interest therein.

Are any exceptions provided for or recognized in the act? The authorization of voting by proxy is certainly not an exception. The right to vote by proxy does not separate the voting right from the property right. He who holds the proxy is but the temporary agent of the stockholder. A proxy confers only a *power* upon the stockholder's deputy, and not a *right*. The *right* still inheres in the stockholder. And proxies, by the very terms of the act, are limited to three years in duration, and are revocable even within that time.

Does section 37 manifest any departure from the general policy? That section declares that every person holding stock as executor, administrator, guardian or trustee, or in any other representative or fiduciary capacity, may represent the same at all meetings of the corporation and may vote thereon as a stockholder. This section cannot by any fair interpretation be extended to include trustees of the mere voting power, who are not in truth stockholders or trustees of any interest in the stock of the company. The general word "trustee" means trustees who have the same sort of interest that executors, administrators and guardians have. To those who *bona fide* hold the property interest under an active trust for others, the voting right is given as an incident to and for the protection of that property interest, just as stockholders who are beneficially interested in their own right have the voting right as incident to their interest. The moment that we realize that the sole reason for the existence of the voting right is the protection of the property interest in respect of which it is to be exercised, that moment we recognize that a so-called "trust," that is uncoupled with any holding of the stock, as stock, or with any duties in respect of the stock as property, and exists only for the purpose of substituting at stockholders' meetings the will of those who are not

interested in the property, in place of the judgment of those who are thus interested, cannot be deemed an "active trust" that will support the voting right as an incident.    There may be room for dispute as to how unimportant may be the duties of a *bona fide* trustee with respect to the property, in order that the right to vote in management of the property may be annexed to the trust, but there is in my mind no doubt that the right to vote cannot be annexed to a trust which holds only the power of voting.    An appurtenant right cannot be appurtenant to itself alone; an incidental power cannot be incidental to itself alone. Such a *status* is to me so unthinkable as a human voice without a human being; as a lever without a fulcrum.    And, of course, to say that the assignment of the mere voting power "in trust" passes to the trustee, by implication, such an interest in the stock as will support the voting power, is the same as to say that the power may be appurtenant to itself alone.    This manifestly begs the very question in dispute, which is whether the voting power may be permanently held by one who holds no other interest in the stock.

Under the dead poll, the donees of the voting power do not hold the stock as property, either in trust or otherwise.    They have no power or duty to sell or dispose of it, and would have no concern whatever with collecting or administering the proceeds of the stock upon a winding up of the company.    There is no *bona fide* placing of the *stock* in trust.    The certificates alone are entrusted to the association; the several depositors retain and control the property interest that lies behind the certificates.

It is suggested here that my construction requires the words "*bona fide*" to be read into section 37, and that these words cannot be supplied there by implication, because they are expressly used in section 39, which relates to the qualification of directors.

But it must be remembered that the Corporation act is a revision of numerous precedent acts.    The present section 37 originated in a general act for establishment of manufacturing companies (*P. L. of 1849 p. 308 § 37*), and was found as section

39 of the Corporation act of 1875. *Gen. Stat. p. 915.* Can the judicial mind seriously contemplate any other kind of stock holding or stock ownership than *bona fide* holding or ownership as entering into the legislative intent in the framing of that section? On the other hand, the section (39) which requires directors to be *"bona fide* holders" of stock had separate origin in a supplement of 1872 to the General Corporation act of 1846 (*P. L. of 1872 p. 89*), found as sections 47 and 48 of the Corporation act of 1875. *Gen. Stat. p. 916.* This act of 1872 was a specific prohibition evidently aimed to correct an existing mischief, to wit, that those who were only nominally stockholders acted as directors of corporations.

It is entirely settled that the incorporation of existing statutes into a revised act in unmodified form does not alter their original meaning. They speak as of the time of their original enactment. See cases cited in *Smith* v. *Colloty, 40 Vr. 370.* The variance in phraseology between sections 37 and 39 is therefore without significance.

I am willing to concede, however, that my view requires the words *"bona fide"* to be implied in the construction of section 37. I go further and say that every section and line of the Corporation act ought to be read as if the words *"bona fide"* shone throughout them. The act was intended, primarily, for the regulation of *bona fide* concerns of business, and there is a presumed intent that the whole act shall be construed according to the dictates of good faith, common sense and practical business judgment. Any other mode of interpretation will surely lead to grievous error.

Is any exception to the general policy (that the right to vote is the personal privilege of the owner of shares) to be found in the latter part of section 37, which declares that every person who shall pledge his stock as collateral security may, nevertheless, represent the same at all meetings and vote thereon as a stockholder, unless in the transfer to the pledgee on the books of the corporation he shall have expressly empowered his pledgee to vote thereon, in which case only the pledgee or his proxy may vote? I think not. This clause simply recognizes that in a

given share of stock there may be separate interests held by two
or more persons adversely to each other. Manifestly, it is not
practicable that they both vote upon the same stock at the same
meeting, and the act therefore leaves it to be arranged by contract
between themselves. Whether pledgor or pledgee votes, the vote
in either case is incident to an actual property interest in the
stock, and the presumption is that by contract it will be so
arranged that to him whose interest is the more important will
be accorded the privilege of voting while the interest continues.

It is strongly argued that section 51 of the act evidences a
distinct legislative reversal of the former policy that stock should
be voted upon only by the owners thereof. It is, in effect, argued
that precisely such a scheme as is embodied in the voting trust
now under review could be carried out by the formation of a
"holding company" having the same objects as the deed poll.
This argument, I think, is transparently unsound. Section 51
declares that

"any corporation may purchase, hold, sell, assign, * * * shares of
the capital stock of any other corporation, and, *while owner of such stock,*
may exercise all the rights, powers and privileges of ownership, including
the right to vote thereon."

But the difference between such a holding company and the
present voting trust is both wide and deep.

A holding company is owner of the stock itself. This "asso-
ciation" is not; it is only a sham owner, vested with a colorable
and fictitious title for the sole purpose of permanently voting
upon stock that it does not own.

The officers of a holding company are responsible to the stock-
holders therein, are subject to be called to account annually and
to be refused re-election if their management of the concerns
entrusted to them is not satisfactory to their constituents. But
under the present voting trust there is no such responsibility—
no such control by the constituents. The constituents, that is,
the owners of the deposited shares, have disabled themselves
from exercising, by force of majorities, any control over the
discretion of the trustees. The only control that is at all

reserved is either to terminate the trust outright or else to simply oust one trustee and put another man in his place; and any such action may be blocked by the holders of one thousand six hundred and two shares out of the total of about fourteen thousand shares deposited; those one thousand six hundred and two shares being of the comparatively worthless common stock. And so long as the trust continues the authority and discretion of the trustees are "absolute and uncontrolled" by the very terms of the deed poll, without the least responsibility of any kind except for proved fraud.

If it be argued that a holding company may acquire more than a majority of the stock of a given corporation, and thereby may control its policy permanently, to the practical exclusion of the minority from any voice in the management, the answer is plain. *First.* Since the majority in interest is to rule in corporation affairs, it is impossible to depart from that principle whether the majority happens to be held by a single person or by a group of persons who act in concert. In this respect the holding company is, of course, like any other partnership of individuals who happen to own in partnership a block of corporate stock. They agree among themselves how the stock shall be voted, and their representative votes it. If they do not agree how it shall be voted, it may not be voted at all. *Secondly.* When the stock is voted upon by its owner or owners, the presumption that runs throughout the Corporation act remains, viz., that since the majority in interest of actual owners are controlling the company, its management will be beneficial to all the owners. In the present case not only are the minority stockholders permanently outvoted, but the majority stockholders are disabled from voting, leaving the control in persons who are not stockholders. And, *thirdly,* although an ordinary holding company is, in the fiction of the law, a single individual, it is in truth and essence an aggregation of individuals, whose views, presumably, will differ among themselves from time to time. In effect, the aggregate number of individuals interested in the stock of the company that is thus controlled may be either increased or decreased by the circumstance that a holding corporation controls a majority

of shares. If the stockholders of the holding company out-
number the original stockholders of the company whose stock
is held, the number of minds concerned in the management of
the latter company is increased rather than diminished by the
circumstance that a holding company obtains control. ·

I conclude, therefore, that by the letter of the Corporation act,
and also according to its spirit and common sense, the power to
vote at corporate meetings is conferred as a personal privilege
upon the stockholders *as such,* in order to enable the owners
and proprietors of the business to control its administration;
that this privilege is inseparably annexed to stock ownership
and cannot be divorced from it; that the exceptions to this
policy pointed out in the Corporation act are only apparent, not
real exceptions, are few in number, and arise *ex necessitate rei,*
and because of the impracticability of allowing two persons to
severally vote upon a single share, from which it results that,
as between pledgor and pledgee, *cestui que trust* and trustee,
the voice of one or the other of these parties is alone to be heard.

How stand the decisions in this state upon the question?

The leading case of *Taylor* v. *Griswold (1834), 2 Gr. 222,*
affirmed in this court, but unreported here, held, in effect, that
the privilege of voting was personal to the stockholder, not to be
exercised by others for him except as permitted by statute. The
precise *rationale* of the decision is, I think, sometimes misunder-
stood through a failure to quote the entire language used by
Chief-Justice Hornblower in summarizing the doctrine. The
case was an inquiry by the supreme court into an election for
directors of an incorporated company. Among other things
it was claimed that the inspectors acted contrary to law in re-
jecting certain votes that were offered by proxies. It was held
that, as the law then stood, the proxies were properly rejected.
The chief-justice said in the course of his argument (*2 Gr.*
*231*): "It does not follow, however, that the corporation have
a right to permit its members to delegate their corporative rights
and send an agent or proxy to represent, deliberate, judge and
vote for them. The obligation and the duty of corporators
to attend in person and execute the trust or franchise reposed

Warren v. Pim.

in or granted to them, is implied in and forms a part of the fundamental constitution of every charter in which the contrary is not expressed." These two sentences should be read together. What I understand them to mean is not so much that the corporators, who participated in the election, were entitled to compel the absentees to attend in person for the benefit of those present, but that those corporators who desired to vote were under an obligation and duty to attend in person to vote and could not send an agent or proxy. That this was the ground of the decision appears throughout the opinion of Chief-Justice Hornblower and also in the reasoning of Justice Ford, who concurred.

In *Cone* v. *Russell, 3 Dick. Ch. Rep. 208,* where complainants, being stockholders, gave a proxy to defendants, being stockholders in the same company, the proxy being irrevocable for five years, and authorizing defendant to vote at all stockholders' meetings upon the complainants' shares, upon an unlawful consideration, Vice-Chancellor Pitney held the agreement void because against public policy, and granted to the complainants an injunction against the use of the proxy, notwithstanding they were *in pari delicto.* It was held, on the authority of Story, that the maxim *in pari delicto* does not apply to a case resting upon the ground of public policy. This is a proposition that I believe will not be disputed.

In *White* v. *Thomas Inflatable Tire Co., 7 Dick. Ch. Rep. 178,* the decision was based upon the proposition that the right to vote is an incident of the ownership of stock, and cannot exist apart from it.

In *Kreissl* v. *Distilling Company of America, 16 Dick. Ch. Rep. 5,* the present chancellor allowed an injunction to restrain the operation of an irrevocable voting trust uncoupled with an interest in the stock.

These three cases were all argued in the court of chancery by able and experienced counsel, and in neither case, I believe, was an appeal taken.

*Chapman* v. *Bates, 15 Dick. Ch. Rep. 17; 16 Dick. Ch. Rep. 658,* is, I think, clearly distinguishable from the present case

in two respects—*first,* because the irrevocable proxy that was under attack was coupled with a substantial interest, in that it gave to the defendants (who were trustees for about eighty per cent. of the stockholders of the company, under an arrangement that excluded none) the right to sell and assign the shares of stock, and to exchange them for stock in a new corporation to be formed, the arrangement having many of the feautres of a reorganization agreement; and *secondly,* because upon the strength of complainants' proxies and those of the other stockholders the defendants had expended money, borrowed money and entered into contracts on the faith of the continued control of the stock during the period mentioned in the instrument, all for the purpose of carrying out the ends of the corporation and for the equal benefit of all stockholders.   Vice-Chancellor Pitney held that under such circumstances it would be inequitable to deprive the defendants of the powers thus given to them *without reinstaling them in their original position.*   This court, on appeal, affirmed the decree, calling attention especially to the fact that the proxy was coupled with an interest, and that upon the faith of it moneys had been expendeed by the defendants. At the same time this court said (*16 Dick. Ch. Rep. 667*) :  "We recognize the principle laid down in *Cone* v. *Russell* and *White* v. *Thomas Tire Co.,* that every stockholder is entitled to the benefit of the judgment of every other stockholder in the management of the affairs of the corporation; but in this case complaint is not made by one claiming that injury has been done to his interest by reason of a stockholder divesting himself of control of his stock, but by one of the very parties who has entered into this agreement, and to which his consent has been given." What was said in the opinion concerning the absence of statutory provision or public policy "preventing a stockholder from giving another powers over, or rights in, his shares in a corporation to the same extent that he might give in any property," must be read in the light of the facts of the case.   The difference between that case and the present is that the deed poll does not in any proper sense give to the association any powers over or rights in the shares covered by it; it transfers no property in-

terest in the shares and no powers over them as property, the voting power being simply separated from the property right.

In *Cone* v. *Russell,* the vice-chancellor, in order to prevent his decision from being given an effect broader than the facts before him, said: "This conclusion does not reach so far as to necessarily forbid all pooling or combining of stock, where the object is to carry out a particular policy with the view of promoting the best interest of all the stockholders. The propriety of the object validates the means, and must affirmatively appear." This language was quoted with approval by the chancellor in the *Kreissl Case,* and was repeated in the *Chapman Case,* both in the opinion of Vice-Chancellor Pitney and in the opinion delivered by Mr. Justice Garretson in this court. As I read the facts in these cases, the *dictum* was in each instance unnecessary for the purposes of the decision. So far as it may be construed as a qualification of the general doctrine declared in those cases—that irrevocable voting trusts, uncoupled with an interest in the stock, are invalid—I cannot give my assent to it. In my humble judgment, the letter and policy of the Corporation act alike require that the right to vote shall inhere in those actually interested, and may be executed by others only under powers revocable in their nature, and limited, at all events, to three years from the time of making. If, therefore, an irrevocable proxy or voting trust be confided to one who is without interest in the stock, it violates the rights of non-assenting stockholders and the policy of the statute, and it is void, notwithstanding the ultimate purpose of the adoption of such means may be considered beneficial to the company. I cannot assent to the doctrine that good purposes and motives are any justification for the adoption of unlawful measures. In our law the end does not justify the means.

Nor can I agree with the declaration of the chancellor in the *Kreissl Case,* that if stockholders, upon consideration, determine that a certain plan for conducting and managing the affairs of the corporation is judicious and advisable, they may combine or pool their stock so as to provide for the carrying out of the plan, if that declaration is intended to sanction an irrevocable

assignment of the voting power, or the establishment of a plan of conduct for the company that shall detract from the power of the actual stockholders annually to determine the policy of the company by the election of managers to conduct its affairs. It seems to me, rather, that the Corporation act, by its very terms and necessary intendment, requires that what is to be beneficial to the stockholders in respect to the management of the company is to be decided by them—not once for all, but from year to year—by the proprietors of the company and their managers annually chosen by them. The very requirement (in section 12 of the act) that all the directors shall be chosen annually unless the certificate of incorporation provide otherwise, that in any event no director shall hold office for more than five years without election, and that the term of office of at least one class shall expire in each year, negatives the notion that the business policy of the company can be lawfully placed beyond the control of the stockholders. The Corporation act does not contemplate that those who happen for a time to own a majority interest in the company shall fix a permanent policy upon the company for a series of years. It contemplates that its policy shall be moulded and shaped from time to time in the light of experience, according to the will of the actual majority in interest for the time being. If there be any danger of instability inherent in such an arrangement, it necessarily results from the very essence of the plan of a stock company controlled by the owners of the stock, and with stock holdings assignable at the will of the members.

If the legislature in its wisdom should deem that such a system is unwise, or unfitted to the exigencies of the time, it will doubtless, in due season, remedy the difficulty by providing for an assignment of the voting right for a time separate and distinct from stock ownership, or by providing that the stockholders may elect their directors for a longer term than is now allowed. Such an amendment of the Corporation act would enable corporators to decide for themselves, in framing their certificate of incorporation, whether they desired to subject their company to the operation of an irrevocable voting trust or its

equivalent.   As the act stands at present, it seems to me to distinctly recognize that, in order to invite the combination of capital and in order to safeguard it, so far as capital embarked in active enterprises can ever be safeguarded, it is deemed essential that the owners of the capital invested in the company shall have the voice at frequently recurring intervals in the management of the company to the exclusion of those who have no like interest.   Flexibility, adaptability, modification, change, improvement—all are provided for by the annual stockholders' meeting, with the free and untrammeled voting privilege vested in those who are the owners of the capital.   With an irrevocable voting trust, uncoupled with an interest in the stock, all this is changed.   To the extent of the stock involved in the trust there is no annual appeal to the self-interest of the proprietors.   And where, as here, the trust includes a majority of the stock, all the actual proprietors are in effect deprived of voice in the management of the company, and the voting trustees become practically a permanent board of directors.

But if it were to be conceded that the qualifications mentioned by Vice-Chancellor Pitney in *Cone* v. *Russell,* and by Chancellor Magie in the *Kreissl Case,* are sound, it would not result in sustaining the deed poll.   That instrument confides the voting power to individuals who are under no enforceable duty either to their constituents or to any other stockholder, and, so far from proposing any programme for the conduct of the company's affairs, it leaves everything to the absolute and uncontrolled discretion of the so-called trustees.

The general trend of decisions throughout the country condemns the irrevocable voting trust.   Some of these decisions are cited in *Cone* v. *Russell* and *White* v. *Thomas Inflatable Tire Co.*   See, also, *Shepaug Voting Trust Cases, 60 Conn. 576; 24 Atl. Rep. 34; Harvey* v. *Linville Improvement Co., 118 N. C. 693; 24 S. E. Rep. 439;* and an article in *38 Am. L. Reg. (N. S.) 1899 p. 50.*

*Brightman* v. *Bates, 175 Mass. 105; 55 N. E. Rep. 809,* is cited as an authority to the contrary.   It is true that Chief-Justice Holmes, in that case, entered into some discussion of the

validity of pooling agreements among stockholders, with the result that he found no reason to disapprove of them *in toto* and under all circumstances. Such a total disapproval would have been necessary to overthrow the covenant there sued on. But he based the decision largely upon the fact that the plaintiff had a general finding in his favor in the trial court. In that part of the opinion, which deals with the validity of pooling agreements and voting trusts, the learned chief-justice, as I take it, employed inaccurate reasoning when he declared "a stockholder has a right to put his shares in trust whatever his motive; if the trust is an active one, he cannot terminate it at will," &c. But in truth and in essence, and for all purposes of a court of equity, a voting trust that has for its sole object the permanent separation of the voting power from the substantial ownership of the share *is not a putting of the shares in trust;* it is a putting of false evidence of share ownership into the hands of the trustee for the purpose of enabling the trustee to represent himself as a shareholder at the stockholders' meetings and thereupon be admitted to the election.

In *Mobile and Ohio Railroad Co.* v. *Nicholas (1893), 98 Ala. 98; 12 So. Rep. 723,* the railroad company was insolvent, and decrees of foreclosure had been made against it, which would have absorbed the entire property and have cut out the interests of the stockholders. The stock had no present value. An agreement was made providing for a transfer of the decrees and the creditors' claims to a trustee for the creditors and the issuance of debentures to the creditors in lieu of their original evidences of debt, the debentures to be secured by a mortgage. The agreement provided that, as further security, the stockholders would place the legal title to their shares in the name of the trustee, and that the trustee should have an irrevocable power of attorney to vote upon it according to the wishes of the debenture holders until the debentures were paid. The case shows (*98 Ala. 118, 119; 12 So. Rep. 732*) that the complainants were assenting stockholders, who had surrendered their stock to the committee of reorganization in order that the arrangement in question might be made, and that the arrangement had been carried into

effect, and rights acquired on the strength of it, before the bill was filed. It was on these grounds that the injunction was denied. Because of the insolvency of the company the debenture holders were the real parties in interest, and the agreement in effect transferred the voting privilege to them pending the continuance of their interest.

In *Smith* v. *San Francisco, &c., Railway Co. (1897), 115 Cal. 584; 47 Pac. Rep. 582; 35 L. R. A. & E. 309; 56 Am. St. Rep. 119,* the agreement that was under review was executed between joint purchasers of a block of stock before they had completed the purchase and become owners by paying the money. It was held that a written agreement between such purchasers that they would for five years retain the power to vote the shares in one body, and that the vote should be determined by ballot between them or their survivors, was a proxy authorizing the vote of all the stock to be cast in accordance with the determination of the majority of the parties thereto, and that the agreement, under the circumstances, did not contravene public policy. The court said (*47 Pac. Rep. 589*) in substance, that voting trusts, where the only consideration for the agreement is the mutual promises of the several stockholders, do not bind the stockholders, and any stockholder may revoke his agreement and withdraw his stock at will. But the court drew a distinction between such an agreement and one that was made between two or more persons contemplating the purchase of stock, the agreement being made as a condition of the purchase. Such was the agreement under consideration. This case is severely criticized by the editor of the *American State Reporter (56 Am. St. Rep. 138),* whose note contains a careful review of the authorities and will repay perusal.

To return to a point already adverted to, it seems to me that the annual election of directors, with no director holding office for more than five years without re-election, is an essential part of the statutory scheme of corporate management. Precisely the same sort of considerations that render limited terms of service proper for public officers apply to the managers of corporations. Accountability to the will of the electorate, and an

opportunity for the interested electors to put into effect their own views, as formed from time to time in the light of experience, are the principal considerations.

This seems to me to be the plan of management and government prescribed by the Corporation act, and as I read the act it may not be departed from even by unanimous consent of the corporators. It is true that many of the provisions of the act, being intended principally for the protection of the corporators themselves, may be waived by common consent. *Breslin* v. *Fries-Breslin Co:, 58 Atl. Rep. 313*. But with respect to the management of the company's business by directors chosen annually by the stockholders, the act places bounds beyond which even unanimous consent may not go. Section 8, paragraph 3, declares that the certificate of incorporation shall set forth, *inter alia,*

"any provision for the regulation of the business and the conduct of the affairs of the corporation, and any limitation or regulation of the powers of the corporation, the directors and the stockholders, *not inconsistent with this act,* which the incorporators may choose to insert."

This is shortly followed by section 12, with its mandatory clauses requiring the business to be managed by directors not less than three in number, chosen annually by the stockholders, "except as hereinafter provided," and with its permissive clause allowing of a classification, limited at the same time by a proviso that no class of directors shall be elected for less than one nor for longer than five years, and that the term of office of at least one class shall expire in each year. And in section 2 of the act it is expressly declared that every corporation "shall be governed by the provisions and be subject to the restrictions and liabilities in this act contained," with a qualification that is not here pertinent.

From these and other sections it is manifest that the legislature did not intend to leave corporators absolutely free to agree, as they please, about the management and conduct of companies organized under this act. The concern of the general public in such matters is referred to by Justice Ford, in *Taylor* v. *Griswold, 2 Gr. 250,* and by Vice-Chancellor Pitney, in *White*

Warren v. Pim.

v. *Thomas Inflatable Tire Co., 7 Dick. Ch. Rep. 178,* especially in his quotations from the leading Connecticut case (at *p. 184*).

Any arrangement that permanently separates the voting power from stock ownership nullifies, to the extent of the stock involved, the annual submission of the question of the management of the company to the stockholders. Where, as here, the arrangement includes a majority of the stock and extends for a period of fifty years, it renders all annual elections in the meantime a hollow form. If I am correct in the view that such an arrangement is wholly prohibited by the act, the deed poll is void as contravening public policy in this respect..

If the prohibition of the act is not absolute, but intended solely for the benefit of the corporators, and subject to be waived by their unanimous consent, yet the deed poll violates the substantial rights of the non-assenting stockholders, and is for that reason contrary to public policy. For, of course, the plan of corporate management prescribed by the act, and the method of corporate control therein provided for, form an essential part of the constitution of the corporation, to the enforcement of which every stockholder is equally entitled.

Public policy is as much concerned in overthrowing contracts that involve or contemplate the commission of a civil injury, the deprivation of civil rights or the perpetration of a fraud upon third parties, as in nullifying contracts that violate a statutory prohibition. *15 Am. & Eng. Encycl. L. (2d ed.) 943.* It is on this principle that agreements to commit a trespass, to publish a libel, to infringe a copyright, to make a sham bid at an auction, and the like, are denounced. The same principle underlies the decision of this court in *Ellicott* v. *Chamberlain, 11 Stew. Eq. 604,* to the effect that an agreement to renounce an executorship is against public policy. So, in *Lynde* v. *Lynde, 19 Dick. Ch. Rep. 736,* this court held a contract between a wife and her solicitor, that for his services in procuring an allowance of alimony he should receive a share of the alimony received, to be void. Although that case disclosed no misrepresentation to the court upon the application for alimony, nor any actual purpose to make such misrepresentation, this

court declared it to be a fraud upon the court, and also upon
the husband, for such an application to be based upon the sup-
posed necessities of the wife, when in truth she had bartered away
in advance a share of what she was to receive. In *Guernsey* v.
*Cook, 120 Mass. 501; Byrd* v. *Hughes, 84 Ill. 174; 25 Am.
Rep. 442; Noel* v. *Drake, 28 Kan. 265; 42 Am. Rep. 162*, the
same principle is applied under varying circumstances. It is on
the same principle that an agreement, whose execution involves
a breach of trust, is held void, as in *West* v. *Camden, 135 U. S.
507*. All such cases involve private injury alone.

It follows, of course, that the non-assenting stockholders, being
the very class against whose civil rights the scheme attempted
to be established by the deed poll most directly and injuriously
operates, are entitled to an injunction against its operation.
All the complainants are in this class, and in this aspect are
entitled to exclude the association from voting upon the
"trusteed" stock, because the persons who constitute the asso-
ciation have no interest, as trustees or otherwise, in the de-
posited stock and hold it solely under an arrangement for the
irrevocable divorcement of the voting power from the owner-
ship. As I read the decree under review, it confines the in-
junction to so much of the deposited stock as is now owned by
certain of the complainants herein. If the British depositors
had been before the court, the injunction might have been ex-
tended to all the deposited stock.

The interest of the non-assenting stockholders, even consider-
ing them merely as lawful voters asking that unlawful voting by
others be prohibited, is sufficiently obvious and entirely settled
by authority. *In re St. Lawrence Steamboat Co., 15 Vr. 529;
In re Leslie, 29 Vr. 609; State* v. *Wrightson, 27 Vr. 126; Smith*
v. *Wanser, 39 Vr. 249, 253*.

Those of the complainants who hold, by purchase, shares of
stock that were placed in the so-called "trust," are not debarred
by the action of their assignors in so doing. They do not claim
any right or remedy by virtue of the illegal agreement but in
repudiation of it. In such a case, depending on grounds of
public policy, these complainants are not debarred by the maxim

*in pari delicto.*   So it was held in *Cone* v. *Russell, 3 Dick. Ch. Rep. 217,* and ought to be held in every similar case.   See, also, *Delaware, &c., Railroad Co.* v. *Trautwein, 23 Vr. 169; Newbury* v. *Luke, 39 Vr. 189.*

A few of the arguments advanced or suggested in opposition to the decree under review remain to be noticed.

Upon the general question we are met with the argument *ab inconvenienti.*   It is said that our modern corporations have become so huge, and their membership so numerous, and stock so widely scattered that it is not practicable for members either to attend meetings in person or to exercise intelligently a personal discretion about the election of directors.   If this were true, it is a question rather for the legislature than for the courts.   Certainly it tends to make more necessary the usual proxies.   But the judgment of the stockholder is as much exercised in his own behalf (although less directly) through the agent or proxy as if the stockholder personally appeared.   And in practice it is, I believe, found convenient for the true owners to control the policy of the company by inter-communication and the grant of temporary proxies, to be used at stockholders' meetings in carrying out, for the time, a definite line of policy. But it certainly would seem that the marvelous progress of the past half century in every line of human effort, carried on, as it is, more and more through the instrumentality of corporations and without the intervention (except in comparatively rare instances) of the irrevocable voting trust, might sufficiently refute the notion that an assignment of the voting power, uncoupled with any property interest, is a necessity of the times.

It is suggested that cases arise where, in order to enable the corporation to borrow money, the stockholders find it necessary or advantageous to vest the management of the company in the lenders for a term of years.   This, of course, may readily be done by pledging their stock as collateral security for the loan, with power to the pledgees to vote on the stock.

The argument that a majority of stockholders have a right to establish a "permanent management" by assigning their voting powers to non-stockholders for a long series of years or

for the life of the corporation, is based upon the idea that the annual stockholders' meeting is a matter of form and not of substance. The arrangement suggested in effect establishes a board of managers, who are neither part proprietors nor responsible to the will of the proprietors, and in the place of a brief tenure of office it .creates a permanent tenure. It treats section 12 of the Corporation act as devoid of practical force and virility. ·

I concede, of course, that each stockholder may at each election vote as he chooses, provided he vote honestly. But from this it by no means follows that he may make an agreement that shall bind his vote for a term of years, as intimated by Chief-Justice Holmes in *Brightman* v. *Bates, 175 Mass. 110.* The pith and essence of the annual election of directors established by the Corporation act is the *periodical appeal* to the self-interest of the proprietors, with the current experience of the company—its success or non-success—to guide them. It is based upon the notion that experience is a safer reliance than prevision; or, in homely phrase, that "hindsight is better than foresight."

It is said that stockholders, in exercising their voting rights, do not stand in a fiduciary relation to each other. But this does not properly apply at all to *ultra vires* acts amounting to a breach of the agreement of incorporation; nor does it give any countenance to the notion that those who are not stockholders may vote. Nor can I concede that a stockholder, in voting, has a right to disregard entirely the interests of his fellow-stockholders. The ethical notion that underlies the maxim, *sic utere tuo ut alienum non laedas,* forbids.

There is a close analogy between corporate elections and the governmental elections after which they are modeled. The practical difference lies chiefly in the number of persons affected. In *Montclair Military Academy* v. *North Jersey Street Railway Co., 36 Vr. 328,* the supreme court took the view that votes conferred upon abutting property owners, entitling them by the voice of a majority in interest to consent to the laying of a street railway, being conferred for the protection of their property, might

be sold for considerations of advantage personal to the voter. But this court unanimously rejected that view. *S. C., 41 Vr. 229, 232.* Justice Dixon, who delivered the opinion here, used the following language: "For the decision of the matter thus contemplated, the legislature treated these owners as a class, every member of which had similar interests to subserve, interests that in some degree were common to all. Properly to meet the confidence thus reposed, it was incumbent on each member to bear in mind and be influenced by those common interests only, so that his judgment would be as fair toward his neighbor as it was toward himself. To permit anyone of the class to barter for private and exclusive gain this power over the concerns of his fellows would be subversive of the benign purpose of the legislature in delegating it."

All the arguments adduced in support of the deed poll are not only based upon a view of the Corporation act quite different from that which I have endeavored to express, but they also proceed upon the theory that the deed poll does in truth establish some sort of trust for the benefit at least of the British stockholders who were subscribers thereto. I confess that a somewhat careful examination of the instrument fails to disclose to me what the trust may be beyond the mere untrammeled exercise by the individual "trustees" and their successors, and their irresponsible delegates and sub-delegates, of a limitless discretion about using or not using the voting power normally incident to a majority of the shares of the Fisheries Company. If there were no other valid objection to the instrument, it seems to me that, as a trust deed, it is void for indefiniteness and uncertainty.

For all these reasons I shall vote for the affirmance of the decree without qualification. All my brethren agree that the relief granted to the complainants in the court below was properly granted, but because of differences of opinion in this court as to the reasoning underlying some of the grounds upon which that relief was granted (as those grounds are declared in the decree under review) the result reached here is a technical "setting aside" of the decree and the substitution of a decree that gives

26

practically the same relief upon substantially the same grounds. I find no fault in the decree below, either in the relief granted or in the expressed grounds for granting it. It seems to me that the deed poll was "unauthorized by the stockholders," both in *fact,* so far as the assignors of the complainants are concerned, and in *law,* as to any stockholders who did authorize it, because they had no legal right or power to give such authorization. I think it is a "fraud upon the stockholders," because it violates the charter rights of non-assenting stockholders and clothes the so-called "trustees" with false *indicia* of ownership of stock in order to enable them to vote at stockholders' meetings upon shares that they do not own and in which they have no interest. And I think it is "contrary to public policy" for the reasons already mentioned.

Judge Vroom requests me to say that he concurs in the views above expressed.

SWAYZE, J.

I agree with the vice-chancellor that the voting trust attempted to be created by the deed poll of November 12th, 1900, was unauthorized by the Fish Oil and Guano Company and Hardman, in whose right the complainants prosecute this suit. I disagree with the vice-chancellor in so far as the decree adjudges that the voting trust was against public policy and a fraud upon the stockholders.

1. The only formal assent given by the stockholders was in response to the circular of June 1st, 1900. This circular stated

"that the only effective way of securing control of the new company to the shareholders in the United Kingdom is by the establishment of a voting trust. That is to say, the trust shall hold, as if it were the absolute owner and holder thereof, the shares in the new company belonging to persons resident in the United Kingdom, and these persons shall accept the certificates of the trust, which will carry all rights and benefits excepting that of voting."

The assent was "to a voting trust, to be constituted as described in your circular letter of the 1st of June, 1900, and I request you to procure such a trust to be constituted." The im-

portant provision in the circular is that which suggests that the trust was to secure control of the company to the shareholders in the United Kingdom. The effect of the deed poll of November 12th, 1900, and of the articles of association of the "Association of Foreign Stockholders" was to secure the control of the company, not to the shareholders in the United Kingdom, but to the three members of the Pim committee and their four associates, and the terms of the deed poll were such that the shareholders assenting were divested of the control for substantially fifty years. The appellants concede that the voting trust is broader than the consents referred to, and that the right of an assenting stockholder, whose whole assent was contained in the answer to the circular of June 1st to withdraw upon being made aware of its character, could hardly be doubted. The contention is that the Fish Oil and Guano Company and Hardman either acquiesced in or ratified the trust as created. It is incumbent upon the appellants to establish such acquiescence and ratification. As to the guano company, the appellants rely upon the fact that Falls, who was from July, 1900, until November, 1902, the chairman of the guano company, knew of the terms of the deed poll; that Condon, who was a director and a member of what is called "the investigating committee" of the guano company, knew of it; that Linklater & Company, London solicitors of the guano company, employed by Falls, had been consulted with reference to the terms of the deed poll; that as early as November 26th, 1900, the attention of the company was called to the fact that a deed of trust had been executed and that a copy of it could be obtained for one shilling, and that thereafter the guano company received its dividend from the trustees. I have no doubt that Condon had some knowledge of the transaction. I do not understand that any of the investigating committee of the guano company, if they, indeed, knew of the form of the deed poll, were in a position to bind the guano company. I have no doubt that Falls had full knowledge of the form of the deed poll. The number of directors or managers of the guano company does not appear in the case, nor does it appear that they had any meeting, as a board, at which the knowledge of Falls and Condon could have been communicated to them, and

the trustees are not shown to have done anything in reliance upon the supposed acquiescence or ratification. Falls, although the chairman of the guano company, was also one of the trustees under the deed poll, in whom vast powers were attempted to be conferred with great freedom from responsibility. He was personally interested, therefore, in conferring broad powers upon the trustees, though it might be detrimental to the guano company, and it is not to be presumed that his knowledge that the Pim committee had exceeded its powers was imparted to the guano company. The underlying principle is the same which was applied by the supreme court in *First National Bank of Hightstown* v. *Christopher*, *11 Vr. 435*, and by this court in *Graham* v. *Orange County National Bank*, *30 Vr. 225;* and *Sudbury* v. *Merchantville Building and Loan Association*, *12 Dick. Ch. Rep. 342;* and by Chancellor Runyon in *Barnes* v. *Trenton Gaslight Co.*, *12 C. E. Gr. 36*, and by Vice-Chancellor Van Fleet in *De Kay* v. *Hackensack Water Co.*, *11 Stew. Eq. 158*. The doctrine of ratification or acquiescence rests upon the fact that the principal has had knowledge of the agent's act and has made no objection. Such knowledge is not imputable to a corporation where the personal interest of the officer having actual knowledge would lead him to conceal his knowledge from the corporation.

There is, however, another objection to holding that the failure of the guano company to object to the deed poll leads to the inference that they acquiesced. The law is thus stated in *Thompson on Corporations p. 310 § 5:*

"Where it is necessary, in order to a ratification, that the ratifying agency should be the board of directors or trustees, the knowledge, which alone will support a ratification, must be a notice communicated to the trustees when sitting as a board, or otherwise acting in their official character."

It is incumbent upon one who relies upon such a ratification to show at least that a majority of the directors had knowledge of the contract and acquiesced and adopted it. *Murray* v. *Nelson Lumber Co.*, *143 Mass. 250; 9 N. E. Rep. 634*. In this case there is no such proof.

Warren v. Pim.

The receipt of the circular of November 26th and the receipt of the dividend are not sufficient to charge the guano company with knowledge of the deed poll. The dividend would have been payable to it in any event, whether a simple voting trust had been constituted, as contemplated by the circular of June 1st, or the more rigid trust created by the deed poll, and the circular of November 26th expressly stated that the association has been formed and the deed of trust executed "with the view of giving effect to the scheme (to which you have already given your adhesion) for the creation of a voting trust." The guano company, upon the receipt of such a circular, had the right to assume that all that had been done by their agents—the Pim committee —was to create such a voting trust as they had assented to; that was a voting trust securing the control to the shareholders and not to the committee themselves. I think, therefore, the appellants entirely failed to show an acquiescence or ratification by the guano company.

As to Hardman, the appellants' affidavits show that he had knowledge "of what was going on in connection with the inception and preparation of the voting trust," but I do not find that they anywhere show that he had knowledge of the contents of the deed poll. He is said to have assured the committee that their action had his entire sympathy and support, but what action is referred to does not definitely appear, and it may well have been the action prior to November, 1900. His receipt of the circular of November 26th, and of the subsequent dividends, only indicates his knowledge that some sort of a voting trust had been created, and he had the right to assume that it was such a trust as was contemplated in the circular of June 1st. The only difficulty I find is Hardman's failure to deny his knowledge of the deed poll, but this may have been a mere omission. The draftsman of Stanley's affidavit seems to have had in mind that it was necessary to deny knowledge of the formation of the "Association of Foreign Stockholders," and the attention of the persons making the affidavits may have been directed rather to the formation of this association than to the execution of the deed poll. We are not justified in imputing knowledge of the contents of the deed poll to Hardman merely by reason of his

failure to deny such knowledge in his affidavit, in view of the fact that the burden is upon the appellants to establish his knowledge and acquiescence. As to both the guano company and Hardman, the deed poll must be held to be unauthorized. That justifies, in my judgment, the relief which the vice-chancellor granted by the decree advised in this cause. It is true that that relief gives the complainants—Church and Heller, Hirsh & Company—as assignees of the guano company and Hardman, the title to the stock, notwithstanding the fact that the guano company and Hardman had assented to some sort of a voting trust in June, 1900. This is justified because the Pim committee did not act upon the assent of the stockholders and form a voting trust which secured the control of the new company to the shareholders in the United Kingdom, but, on the contrary, abandoned that scheme and formed a voting trust of an entirely different character, which secured the control of the company to the Pim committee in excess of their authority from their principals.

2. The vice-chancellor decreed the voting trust to be contrary to public policy.

Although I agree that the relief granted by him is justified by the facts of the case, I think that, in this respect, the decree is erroneous, and the question raised is of such importance and so far-reaching in its consequences that I cannot approve this portion of the decree. The doctrine established in this state, in *Taylor* v. *Griswold, 2 Gr. 222 (1834)*, has been very much modified by later statutes and decisions. It was modified soon after it was rendered by the statute of 1841 (*P. L. of 1841 pp. 116, 117*), which authorized stockholders in all incorporated companies, whose charters did not otherwise provide, to vote by proxy at the election of directors, but the proxy was not to be received for more than three years from its date. It was modified in the Manufacturing Companies act of 1846 (*P. L. of 1846 p. 64*) by permitting votes by proxy (§ *11*) without the three years' limitation, by permitting executors, administrators, guardians or trustees to represent the stock in their hands, and by permitting every person who pledged his stock as collateral to represent the same and vote as stockholders (§ *41*). These provisions, except that limiting proxies to three years, were re-

enacted in 1849 (*P. L. of 1849 p. 300* §§ *11, 37*), and with the limitation in the revised act of 1875 (*Rev. p. 181* § *21; p. 184* §§ *38, 39*), the privilege was still further extended by the Revision of 1896, so that persons, holding stock in their representative or fiduciary capacity, may represent the stock, and the pledgee of stock may vote thereon when empowered so to do by the pledgor It is now settled by a decision of this court, that pooling or combining of stock, where the object is to carry out a particular policy with a view to promote the best interest of all the stockholders is not necessarily forbidden. *Chapman* v. *Bates, 16 Dick. Ch. Rep. 658* (at *p. 667*), approving of the vice-chancellor's *dictum* in *Cone* v. *Russell, 3 Dick. Ch. Rep. 208*. No illegal purpose appears in this case unless the mere fact of a combination to control a corporation for a period of fifty years in the interest of certain stockholders is in itself illegal, or unless it is made illegal by the fact that the attempt is made to vest the control of the corporation in another corporation organized under the laws of a foreign country. I proceed to consider these objections in order.

It is said that we must hold a combination of stockholders for the purpose of controlling a corporation to be illegal, because every stockholder is entitled to the benefit of the judgment of every other stockholder in the management of the affairs of a corporation, but this statement does not go far enough to justify the condemnation of an arrangement by which a stockholder parts with the voting power of his stock, for his judgment may be that the best interests of the corporation require permanency of management for a long series of years, or for the life of the corporation. If his fellow-stockholders have the right to insist upon his exercising his judgment in the management of corporate affairs, they clearly have no right to dictate to him how that judgment shall be exercised. It is necessary, therefore, in order to condemn such arrangements, to go further and say that every stockholder has a right to insist that his fellow-stockholder shall keep the vote upon his stock untrammeled by arrangements for its control which he personally may consider advantageous to the corporation.

This contention is in direct conflict with the right of a stock-
holder of a corporation to exercise his judgment as he thinks
best, as long as he does not seek to secure any unfair advantage
to himself over his fellow-stockholders. If the only object of
the voting trust is to secure permanency of management, with
a view to what the stockholder honestly considers to be the best
interest of the corporation, I see no objection to the adoption
of any necessary means authorized by the statute to secure that
end. When it is said that the stockholder of a corporation is
entitled to the benefit of the judgment of every other stock-
holder in the management of the affairs of the corporation, it
cannot be meant that he is entitled to hamper in any way the
free and honest exercise of his fellow-stockholders' judgment.
He may, on each occasion, act as he chooses, and, as Chief-
Justice Holmes intimated in *Brightman* v. *Bates, 175 Mass.
105; 55 N. E. Rep. 810,* the question is whether it is un-
lawful to contract to do what it is perfectly lawful to do. The
legality of the purpose must depend upon the good faith of the
stockholder and upon whether his purpose is the general wel-
fare of the corporation. If it is, I cannot believe that purpose
is made illegal merely because he may think that the general
welfare of the corporation will be promoted by securing per-
manency of management for a long series of years. The fact
that the voting power is surrendered for a long series of years
may be an important, or even a controlling, fact in determin-
ing the question of good faith of the stockholder. A case may
readily be conceived where such action would indicate bad
faith and a desire to secure an advantage of a fellow-stock-
holder rather than the good of the corporation. But can it be
contended that, if a corporation finds it necessary to borrow
money upon bonds issued for a long term of years, the stock-
holders cannot, consistently with public policy, in order to
secure the loan, vest the management of the corporation in
hands satisfactory to the lenders and for a term commensurate
with the loan? Nor do I think that it can be said to be con-
trary to public policy for stockholders to combine for a long
term of years, because such a combination may enable a mi-

nority to control the corporation. Practically the only way in which holders of small amounts of stock can protect themselves at all is by means of a combination by which they act together. If this is not permitted to them, large stockholders, even though they may not hold a majority of the stock, will possess a great advantage in the management of the corporate affairs, and I cannot see how public policy is violated by allowing small stockholders to make their union effective by making it endure for more than three years. As I read the cases of *Cone* v. *Russell, 3 Dick. Ch. Rep. 208; White* v. *Thomas Tire Co., 7 Dick. Ch. Rep. 179; Kreissl* v. *Distilling Company of America, 16 Dick. Ch. Rep. 5,* all of which were in the court of chancery, *Chapman* v. *Bates, 16 Dick. Ch. Rep. 658,* in this court, "if stockholders determine and adjudge that a certain plan for conducting and managing the affairs of the corporation is judicious and should be adopted, they may, by powers of attorney, or the creation of a trust of their stock, so combine their powers as to provide for the execution of the plan so determined upon," but the validity of the scheme depends upon whether the purposes in view are for the interests of the corporation or for the purpose of securing an unfair advantage to the combined stockholders. The language I have quoted is taken from the chancellor's opinion in the *Kreissl Case.* Vice-Chancellor Pitney, in *Cone* v. *Russell,* said that "the propriety of the object validates the means and must affirmatively appear." This would apparently impose the burden of establishing good faith upon the stockholders entering the combination; but if it is once established that such a combination may, under proper circumstances, be legal, it would be contrary to the ordinary rule to assume that the purpose is fraudulent, and in my judgment the burden of establishing that the combination is for an unfair purpose must rest upon those who so assert.

While the legality of the combination must be determined by the good faith of the combining stockholders, the legality of the means adopted must depend on whether the means is authorized by our statute. Under the rule in *Taylor* v. *Griswold,* it cannot

be made effective by means of proxies, except as far as the statute. has authorized them. That, however, is not the present case. The legal title to the stock of the Fisheries Company is in the Pim committee. The Pim committee are stockholders. It is said that they are only stockholders in name, and that the judgment which is to be exercised must be the judgment of the stockholders having the beneficial interest. It is a mistake to say that in arrangements of this kind the trustees are stockholders only in name. In substance, each stockholder who enters the combination gives to every other stockholder who enters it an interest in his stock and acquires, in exchange, an interest in the stock of every other holder as long as the combination continues. When, for the purpose of effectuating the objects of the combination and to facilitate the carrying out of its purposes, the legal title is vested in trustees, as in this case, those trustees must take such a title as is necessary to effectuate the intent of the depositors of stock to grant and to acquire mutual rights each in the other's stock.

The beneficial interest which the trustees have is the interest to see that the trust is properly executed and the reciprocal beneficial rights of their *cestuis que trust* preserved. In the present case there is a more definite interest arising from the fact that the trustees are required to receive and disburse dividends, to raise or borrow on the security of the deposited shares any money required for the purposes of the execution of the trust, and to take all such actions and proceedings as they think expedient to protect the interest of the owners of the deposited shares. I agree with Chief-Justice Holmes' *dictum,* in *Brightman* v. *Bates,* that it might be held that the duty of voting makes the trust an active one. The right to vote is, I think, a property right and a very valuable right, and I see no reason why the owner of such a right, having the legal title to the stock, has not also a beneficial interest in the stock itself. It was held in *Chapman* v. *Bates, 16 Dick. Ch. Rep. 658,* that the proxy and power of attorney in that case was coupled with an interest and was irrevocable for the time specified, which was less than three years. If the power of attorney in *Chapman* v. *Bates* was a power coupled with an interest, I think that the legal owner of

stock, even though his only beneficial interest is the right to vote thereon, must be held to have a beneficial interest in the stock itself.

It would be inequitable to allow a depositor of shares to withdraw, for such a withdrawal deprives his fellow-depositors of the interest in his shares, which he gave in consideration of an interest in their shares. It is quite as much a matter of public policy that parties should be held to their contracts as that they should keep untrammeled their right to vote in accordance with their individual judgment for the time being. As I have already said, the non-assenting stockholders have no right to object if the assenting stockholders are acting in good faith for the common benefit.

It is to be remembered, in considering the question of public policy, that the right to vote upon the stock of a corporation is a very different thing from the elective franchise. The very scheme of a corporation contemplates that stockholders may act for their pecuniary interest, and, clearly, there would be no objection to a stockholder selling his stock for the best price he could obtain, even though he knew that the object of the purchaser was thereby to secure the control of the corporation by the exercise of the voting power on the stock purchased.

The Corporation act contemplates that the vote shall be cast by the owner of the legal title. It is provided that the stock and transfer-books shall be the only evidence as to who are entitled to vote at an election, and that executors and trustees, or those holding stock in any other representative or fiduciary capacity, may vote, and the pledgor of stock has the vote thereon unless he expressly empowers the pledgee to vote, although the real beneficial interest of the pledgor may be merely nominal. It is no answer to say that the court would compel the holder of the legal title to vote in accordance with the beneficial owner's instructions, for the court would only do that in a case where the holder of the legal title had no beneficial interest whatever, and that, as I have said, is not the case where the voting right has been expressly conferred upon the holder of the legal title.

I do not question that public policy may require a modification of our liberal Corporation acts, and many of the arguments urged

in favor of the view that voting trusts are contrary to public policy are arguments which would very properly be addressed to the legislature; but, in my judgment, it is for the legislature to determine our policy in this respect, and it is not for the courts to hamper the owner of stock in the arrangements he desires to make by the introduction of disputable suggestions of public policy.

Upon examining the trust created by the deed poll, I fail to find therein any suggestion that the voting trust was conceived for the purpose of defrauding any stockholder of his rights. It seems to me, rather, to have been conceived in good faith for the purpose of protecting the numerous small stockholders—of securing a conservative management of the Fisheries Company, and saving it from the insolvency which overtook its predecessor. The British stockholders, all of whom were given an opportunity to join the trust, had been recognized as a distinct class by the order of the court of chancery providing for the reorganization of the American Fisheries Company; that order gave, by its express terms, to the British stockholders the right to reorganize the American Fisheries Company upon supplying cash to the amount of half a million of dollars within sixty days, and it gave the American stockholders a similar right after the expiration of the sixty days, only in case the British stockholders failed to carry out the plan of reorganization. The British stockholders did carry out the plan of reorganization and secured, either by their own contributions or those of others co-operating with them, the money required. Under the case of *Chapman* v. *Bates,* and the view adopted by Vice-Chancellor Pitney in *Cone* v. *Russell,* it ought not now to be in the power of other stockholders to question the voting trust formed by those who contributed the money for the reorganization of the company. It can only be questioned by those who assented to the trust, and by them only on the ground that the trust, as constituted, was not in accordance with their assent.

It is said that the provisions of the deed poll for the release of the trustees from liability in specified contingencies are such as indicate a design to defraud. Those provisions, however, even if they indicated such a design, could not indicate a design

to defraud stockholders of the Fisheries Company of any of their rights; they do not affect non-assenting stockholders; they only release the trustees from liability to the *cestuis que trust* who may have assented thereto. There is nothing in the case to show that these provisions are illegal either under English law or our law. Mr. Justice Joyce, in his opinion in *Ansell* v. *Pim,* in the chancery division of the high court of justice in England, while condemning the deed poll on the same ground on which we condemn it, does not suggest that these provisions exempting the trustees from liability are improper.

It is further urged that the means adopted are unauthorized by the statute and against public policy, because the deed poll contemplated that the shares should be vested in a foreign corporation. In my judgment the history of the legislation shows that authority to hold stock in a New Jersey corporation has been conferred upon foreign corporations by section 51 of the act of 1896. *P. L. of 1896 p. 294.* At the time the Corporation act was revised there were in existence five acts upon this subject: Section 55 of the Corporation act of 1875, as amended in 1889 (*P. L. of 1889 p. 412; Gen. Stat. p. 952 pl. 213*), and the act of 1888 (*P. L. of 1888 p. 445; Gen. Stat. p. 986 pl. 351*) and the act of 1891 (*P. L. of 1891 p. 329; Gen. Stat. p. 988 pl. 363*) were of very limited scope. The act of 1893 (*P. L. of 1893 p. 301; Gen. Stat. p. 963 pl. 260*) authorized any corporation created under the provisions of the General Corporation act to hold and dispose of stock of corporations created under the law of this or any other state, and to exercise, while owners of such stock, all the rights, powers and privileges, including the right to vote thereon, which natural persons, being the owners of such stock, might exercise. By the act of April 4th, 1888 (*P. L. of 1888 p. 385; Gen. Stat. 983 pl. 345*), it was made lawful for any corporation of this state, or any other state, doing business in this state, and authorized by law to hold shares of stock of corporations of other states, to hold the same with all the rights, powers and privileges of individual owners. At the time of the revision, then, a corporation organized under the General Corporation act was authorized to hold stock in corpora-

tions of this or any other state, and a foreign corporation, doing business in this state, was authorized by our law to hold stock of the corporation of another state. In 1896, the legislature, in the revision of the Corporation act, enacted that

"any corporation may purchase, hold, sell, assign, transfer, mortgage, pledge or otherwise dispose of the shares of the capital stock of, or any bonds, securities or evidences of indebtedness created by any other corporation or corporations of this or any other state, and while owner of such stock may exercise all the rights, powers and privileges of ownership, including the right to vote thereon." *P. L. of 1896 p. 294 § 51.*

The same legislature which passed the Revision of 1896 repealed the acts of 1888 and 1893, above referred to (*P. L. of 1896 p. 317 §§ 118, 323*), and there can be no doubt that section 51 of the revised act was intended to supply the place of the then existing statutes. This object was accomplished by a modification of the act of 1893; the essential change was the omission of the words "created under the provisions of the act to which this a further supplement." The omission of these words makes it clear that the legislature in 1896 intended to extend the power of holding stock in other corporations to corporations not created under the general act; and the words used in the act of 1896 are sufficiently broad to embrace every corporation, foreign as well as domestic. It is said that the meaning of the words "any corporation" in this section is to be limited to a corporation of this state. If the subject-matter of the legislation concerned only the management of the holding company, this argument would be very forcible, for the regulation of the affairs of a foreign company would not be a natural subject for our legislature to deal with; but the fifty-first section authorized the holding of stock of New Jersey corporations by other corporations, and it required the authority of our legislature to enable a foreign corporation to hold stock in a New Jersey corporation, even if its own foreign charter gave it such authority; the rights of stockholders of a New Jersey corporation, whether such stockholders were individuals, New Jersey corporations or foreign corporations, were a proper subject to be regulated by our act. The legislature had already, by the act

of 1888, undertaken to confer authority upon foreign corporations, doing business in this state, to hold stock in foreign companies, and there is nothing to indicate that the legislature would have repealed the act of 1888 without providing any substitute to take its place. I am led, therefore, to the conclusion that the words "any corporation," in section 51, are not to be narrowed by construction to mean "any corporation of this state."

I am confirmed in this view, not only by the history of the legislation, but by the fact that section 51 purports to authorize a corporation of New Jersey to hold stock in a foreign corporation, with all the privileges of ownership. To make this effective, it would be necessary that the legislation of the foreign state should permit our corporation to avail itself of the power conferred by our statute. The legislature, having put itself in the position of conferring such powers as to foreign corporations upon a New Jersey holding company, would not have denied a similar right in a New Jersey corporation to a foreign holding company. We ought not to adopt a construction which would put the legislature in the position of seeking for privileges which it was not willing to grant, unless we are forced to do so by the language of the statute. The legislature has in other sections evinced the greatest liberality toward foreign corporations. By the act of 1896 foreign corporations were authorized to acquire and hold real estate for the purpose of prosecuting their business, or such real estate as they might acquire by way of mortgage, and in 1902 (*P. L. of 1902 p. 170*) all limitations upon the holding of real estate by foreign corporations were removed.

The language in other sections of the Corporation act also confirms me in this view. While the practice of the draftsman of the act was not absolutely uniform, in nearly every case when a provision was by its language applicable either to foreign or domestic corporations only, the draftsman indicated which he meant by express words. Examples are to be found in sections 7, 27, 28, 43, 44, 48, 49, 95 and 96; so, also, in the supplement of 1897 (*P. L. of 1897 p. 175*); the act of 1899 (*P. L. of 1889 p. 174*); the act of 1899 (*P. L. of 1899 p. 334*); the act of 1900

(*P. L. of 1900 p. 316*) ; the act of 1900 (*P. L. of 1900 p. 418*). Where there is no limitation upon the general words, as in section 18 as originally adopted, the provision is necessarily limited by its character to New Jersey corporations; and even in section 18, by the amendment of 1901 (*P. L. of 1901 p. 245*), a limitation was introduced limiting the provisions to corporations organized under the act. Where the words are general, without qualification, and not necessarily limited by the character of the power conferred to New Jersey corporations, they are manifestly applicable to all corporations, foreign and domestic, as in section 110, providing for the taxation of property.

The history of the legislation, the consideration of comity towards other governments, and the use of language limiting and defining the class of corporations in other sections and its omission in section 51, lead me to the conclusion that the words "any corporation," in that section, are to be taken in their natural sense, and not to be limited by construction to corporations of New Jersey. It was suggested on the argument that it was against our policy to allow an alien corporation to hold stock. It was not questioned by the court, in the *St. Lawrence Steamboat Company Case, 15 Vr. 529* (at *p. 534*), that the Canadian stockholder had a right to vote by proxy. The right of a foreign corporation to do business in this state is expressly recognized by the Corporation act (sections 96 and 97), and it is provided that they shall be subject to the provisions of the act so far as the same can be applied to foreign corporations, and section 101 provides for retaliatory action by this state against foreign corporations, not only of another state, but of another nation, where, by the laws of the other state or nation, greater burdens are imposed upon New Jersey corporations than New Jersey imposes upon the corporations of the other state or nation. Similar legislation was enacted in 1904 (*P. L. of 1904 p. 384*) by an act which, in express terms, refers to corporations of other states, territories and countries as foreign corporations. The same designation, "foreign corporation," applies whether it is a corporation of another state or another country. Section 2 provides that the assessment made pursuant to the act shall be a

lien upon the property, real and personal, of the corporation within the State of New Jersey.

An English corporation may hold property, real and personal, in New Jersey. Why should stock of a New Jersey corporation be excepted from the kinds of property it may hold, since we recognize the right of our own corporations to hold stock in other corporations, and to make such exception requires us to limit, by construction, the words "any corporation," in section 51? Comity is not limited to our sister states. The question raised in the early and leading case of *Bank of Augusta* v. *Earle, 13 Pet. 519* (at *pp. 589, 590*), was whether the comity which would admittedly be extended to a corporation of another nation was to be extended to a corporation of a sister state.

If an English corporation can hold stock in a New Jersey corporation, it must be entitled to vote. Section 51 provides that the holding company, "while owner of such stock," may exercise the rights of ownership, including the right to vote. I think the word "owner," as here used, means only the legal owner of the stock, but even if it should be construed to mean the beneficial owner, the right to vote, and the other powers conferred by the deed poll, would make the trustees under that deed beneficial owners.

It is also suggested that the holding company, under section 51, must be a corporation with capital stock, such as our General Corporation act provides for; but if it once be conceded that the section authorizes a foreign corporation to hold stock in a New Jersey corporation, the method of constituting and managing the affairs of the foreign corporation must be left to the regulation of its own government. The fact that the Association of Foreign Shareholders is a corporation without capital stock is important and controlling in the determination of the question whether the assent, given in response to the circular of June 1st to a voting trust controlled by the shareholders, was properly carried out by the organization of a corporation in which the shareholders of the Fisheries Company had no voice; it is not important in determining whether the Association of Foreign Shareholders was a corporation within the meaning

of section 51. That question must be determined "rather by the faculties and powers conferred upon the body than by the name or description given to it." *Edgeworth* v. *Wood, 29 Vr. 463, 467.*

In the leading case of *Liverpool Insurance Co.* v. *Massachusetts, 10 Wall. 566,* the tests applied by Mr. Justice Miller to determine whether the insurance company was a corporation were (1) that it had a distinctive and artificial name by which it could make contracts; (2) that it could sue and be sued in the name of one of its officers; (3) that it had perpetual succession by transfer of shares; (4) that it had an existence as an entity, apart from the shareholders. It can hardly be said that the method adopted to represent the individual interests of those interested in the corporation is a test of whether the organization is a corporation or not; and this is especially the case since the revised Corporation act has, by section 18, given every corporation power to create

"two or more kinds of stock of such classes, with such designations, preferences and voting powers, or restriction or qualification thereof, as shall be stated in and expressed in the certificate of incorporation."

We have also a statute authorizing not only individuals but societies and clubs to organize a corporation without capital stock (*P. L. of 1898 p. 422,* as amended by *P. L. of 1902 p. 639*), and our act relating to savings banks (*Gen. Stat. p. 3000*) provides for the management of these important financial institutions by a self-perpetuating board of managers, whose only interest is that of trustees. By the act of 1901 (*P. L. of 1901 p. 307*) savings banks are authorized to loan on notes secured by stocks of national and state banks and of certain corporations of this state. In the face of this legislation, I am unable to see how the public policy of this state is opposed to allowing corporations without capital stock to hold stock in New Jersey corporations.

I conclude that there was nothing in the deed poll which made it proper for the court of chancery to decree that it was against public policy.

The chief-justice, Justices Fort and Garretson, and Judges Voorhees and Gray concur in the views herein expressed.

Green, J. (concurring in the decree).

Although, as already observed, the pleadings, affidavits and exhibits are voluminous, and although the questions discussed are important and the interests at stake are large, the decision of this court may, in my humble judgment, rest upon a principle of corporation law which is at once simple and sure.

The principle to which I allude is the equality of each share of stock in the eye of the law. This principle appears to be our settled policy with respect to corporations. It has an illustration in the right of voting at corporate elections, when (although it was not so many years ago) each shareholder is entitled to one vote for each share by him held. See revised Corporation act of 1896, section 36. We find another illustration in the declaration of dividends, wherein each shareholder is entitled to the same rate per cent. upon each share by him held (see revised Corporation act, sections 30 and 47; *Laurel Springs Land Co. v. Fougeray, 5 Dick. Ch. Rep. 756, 759; Griffing v. Griffing Iron Co., 16 Dick. Ch. Rep. 269, 270; Bouv. Dict.,* word "dividend;" *Morawetz Corp. (2d ed.)* § *435*); and another illustration in assessments upon stock not fully paid up (see revised Corporation act, section 21); and yet another illustration in the increase of capital stock, when the shareholders are entitled to take the new shares in proportion to their several holdings (see revised Corporation act, section 47; *Way v. American Grease Co., 15 Dick. Ch. Rep. 263, 269*); and yet another illustration in the distribution of any surplus assets of an insolvent corporation (see revised Corporation act, section 86). The principle of share equality is not to be departed from, unless the departure be sanctioned by law—either expressly declared or negatively suffered—and by the contract relation of the shareholders. Illustrations of departure thus allowed may be found in the classification of shares, usually as preferred and common (see revised Corporation act, sections 8 and 18); and

in special powers of voting at meetings other than for elections (see revised Corporation act, section 17).

I think it is but an outgrowth of this principle of share equality that in the decisions of our courts, whether upholding or overturning a particular voting trust, it has been plainly held that the validity of such a trust is subject to at least two limitations, to wit, (a) that the holders of all of the shares of the corporation shall have an equal privilege (after fair information) of availing themselves of the trust agreement, if they shall so choose; and (b) that the object and aim of the trust shall be the equal benefit of all the shares.

In *Cone* v. *Russell & Mason* (*1891*), *3 Dick. Ch. Rep. 208*, there was a voting agreement which had been made and entered into, to be binding for five years. In setting aside this agreement, Vice-Chancellor Pitney said (at *p. 215*) : "I conclude that the contract complained of in this case is void as against public policy. This conclusion does not reach so far as necessarily to forbid all pooling or combining of stock where the object is to carry out a particular policy with a view to promote the best interests of all the stockholders. The propriety of the object validates the means and must affirmatively appear."

In *Kreissl* v. *Distilling Company of America* (*October, 1900*), *16 Dick. Ch. Rep. 5,* there was under consideration an agreement for a voting trust, entered into by certain shareholders of the distilling company. In setting aside the agreement, at the suit of another shareholder, the present chancellor said (at *p. 14*) : "If stockholders, upon consideration, determine and adjudge that a certain plan for conducting and managing the affairs of the corporation is judicious and advisable, I have no doubt that they may, by powers of attorney, or the creation of a trust, or the conveyance to a trustee of their stock, so combine or pool their stock as to provide for the carrying out of the plan determined upon. But, if * * * they reserve to themselves any benefit to be derived from such a plan to the exclusion of other stockholders who do not come into the combination, then, in my judgment, such combination and the acts done to effectuate it are contrary to public policy, and other

stockholders have a right to the interposition of a court of equity to prevent its being put into operation. The agreement in this case must be tested by these principles."

And, further. (at· p. 17) : "By the provisions of the fifth article of the agreement, stockholders who do not enter into it are expressly declared to be entitled to no benefits under it. * * * It is sufficient to say that the agreement discloses an intent to exclude stockholders who do not enter into it from whatever benefits could be claimed thereunder. This, in my judgment, shows a combination contrary to public policy, and one to which any non-assenting stockholder may object."

In *Chapman* v. *Bates and Lee* (*November, 1900*), *16 Dick. Ch. Rep. 658,* a paper called a proxy and power of attorney was sustained in this court. It gave voting powers and rights of dealing with the stock of the parties; and negotiations had been entered into and moneys expended on the faith of it. Justice Garretson, speaking for the whole court, said (at p. ·667) :

"No illegal purpose is manifest upon the face of this agreement, neither has any been alleged in the bill. It appears to be consistent with the purposes for which the company was created, and its continuance appears to be necessary for the advantage of all who are interested in the development of the property; it is expressly declared to be for the benefit of all who join in it. No stockholder is prevented from joining in the agreement, and no stockholder who has not availed himself of the opportunity to join in it is excluded from the benefit of it; no one appears to have been injured by it."

These quotations appear to me fully to sustain the view that, in order to the validity of a voting trust in New Jersey, at least the two limitations above set forth, (a) and (b), must be regarded. Have these been duly regarded in the voting trust under consideration?

Although the original plan of reorganization of the American Fisheries Company, predecessor of the Fisheries Company, provided a fair opportunity of coming in for all shareholders, whether American or foreign (see Warren's letter of April 20th, 1900, and the Pim committee's report of April 26th, 1900),

organization under the certificate of incorporation of the new Fisheries Company, May 23d, 24th, 25th, 1900, could hardly have been perfected when the Pim committee sent out, to the foreign shareholders only, the circular of June 1st, 1900, proposing and outlining a plan, or "voting trust," for securing control of the new company, to the shareholders in the United Kingdom; by which means the Pim committee hoped, and so averred, that a solid controlling vote would be obtained on all important questions at the company's meetings in America. In furtherance of the plan, or trust, the Pim committee actively brought about the incorporation, early in November, 1900, of the Association of Foreign Shareholders of the Fisheries Company of New Jersey, Limited, under the Companies acts of Great Britain, and then the Association of Foreign Shareholders and the Pim committee executed the deed poll of November 12th, 1900 (already referred to), as the capstone of their plan. The dominant idea running through these instruments (articles of association and deed poll) is, for the present discussion, sufficiently indicated by the name and title of the association. Under these instruments, the court below pertinently remarks, the trust was naturally and necessarily confined to the foreign shareholders; and we may, as pertinently, add, the benefit thereof was naturally and necessarily to be confined to the same shareholders, even though the results might be the very opposite of beneficial to the American shareholders. Nothing more need be said to show that the voting trust, or agreement, created or attempted to be created by the Pim committee, ignores or denies the limitations laid down in the *Cone, Kreissl* and *Chapman Cases,* above cited at length.

Now, I do not deny that, in a particular juncture of a company's affairs, the holders of a bare majority of shares may combine together to accomplish, by their votes, a particular result in company management, and that, as remarked in the *Kreissl Case,* there are more ways than one in which this may be done. Such a combination is nothing more—brings about nothing more—than the rule of the majority, after a discussion and upon a ballot, in which, in respect of each share, there are equal

Warren *v.* Pim.

voice and vote. See *Camden and Atlantic Railroad Co.* v. *Elkins, 10 Stew. Eq. 273, 276.* It is the method adopted in the case in hand which is obnoxious to law. Not only does the voting trust, as devised, fail to disclose the propriety of the objects ultimately to be attained (see the *Cone Case*); not only does it fail to allow shareholders not entering into it to enjoy the benefits to accrue from it, whatever such may be (see the *Kreissl Case*); but it reveals, in its necessary operation, a marked inequality in the voting power of different shares. This it does, notwithstanding that neither in the certificate of incorporation of the Fisheries Company nor (so far as shown) in any by-law is any provision made for such departure from equality as our laws permit. See revised Corporation act, sections 17 and 36; *Camden and Atlantic Railroad Co.* v. *Elkins, supra; Loewenthal* v. *Rubber Reclaiming Co.,* 7 Dick. Ch. Rep. 440. Be it observed that the deed poll of November 12th, 1900, declares that the voting trust may be terminated only by one of the events following:

"(1) When and so soon as the association by deed declare that it is to be closed.

"(2) When the owners of three-fourths of the deposited shares of each class, by notice in writing to the association, declare the trust to be closed.

"(3) When the last survivor of the now existing descendants of Her Majesty shall have been dead for twenty years.

"(4) When fifty years from the execution hereof shall have elapsed."

Of these four events the second only is within the control of the shareholders at all, and this control may, under the facts shown by the pleadings and proofs, operate in manner following:

```
Preferred shares (American holders) ............. 9,995
    "        "    (foreign holders) ............. 10,005
Common       "    (American holders) .............   524
    "        "    (foreign holders) .............  4,803
                                                  ------
    Total    "    outstanding ................... 25,327
                                                  ------
    One-seventh of the whole................... 3,618
```

Assume that all of the foreign shareholders come in under the association of foreign shareholders and the·deed poll, and there would be, of

| | |
|---|---|
| Preferred shares ........................ 10,005 | |
| Of which one-fourth is........................ | 2,501 |
| Common shares ........................ 4,803 | |
| Of which one-fourth is........................ | 1,201 |
| | 3,702 |

and· the holders of these three thousand seven hundred and two shares, by refraining from action, can secure the continuance of the voting trust, and all the consequences that may flow therefrom, against the will of the holders of all other shares. To put it in other words, about one-seventh of the shares can control the other six-sevenths, and each share in the one-seventh will, without authority in law, have the power of six in the other sevenths. Not only, then, does the plan or trust ignore or defy the two limitations (a) and (b), but it ignores or defies the settled statutory policy of the equality of shares in the eye of the law.

It has been suggested that section 51 of the revised Corporation act, in its logical effect, permits the inequality pointed out, but I cannot accede to such a view. This section, in my opinion, permits a corporation to take and hold the shares of another corporation, and, respecting such shares, to enjoy the same rights, powers and privileges which a natural person would enjoy. See *State* v. *Rohlffs, 19 Atl. Rep. 1099.*

When, through such corporate ownership, it is sought, by a species of jugglery, to overturn the settled policy of the law, the attempt should not, in my view, receive sanction from this court.

Believing that the voting trust is contrary to the policy of our Corporation laws, I have no difficulty in concluding that it should be set aside, and that the other relief sought by the bill of complaint should be accorded.

Some subordinate questions remain to be considered:

1. The parties complainant are the legal holders of certain shares in the stock of the Fisheries Company, on which they

are entitled to vote, and they are also the equitable holders of certain other shares, whereof the legal title is in the Pim committee or the Association of Foreign Shareholders.  The question arises, are the complainants entitled to any right of challenging the validity of the voting trust in respect of both classes of shares or in respect of the former class alone?  I think in respect of both.  This question (as it relates to assenting shareholders) was before the court of chancery, in the case of *Cone* v. *Russell and Mason, supra,* and was there decided (rightly, as I believe) in accordance with the view now expressed.  That decision (see *3 Dick. Ch. Rep. 216, 217*) was placed upon two grounds, of which I prefer the second.  This ground is thus expressed in *1 Story Eq. Jur. (13th ed.)* § *298:*

"In general, where parties are concerned in illegal agreements or other transactions, whether they are *mala prohibita* or *mala in se,* courts of equity, following the rule of law, as to participators in a common crime, will not at present interpose to grant any relief.  But in cases where the agreements or other transactions are repudiated on account of their being against public policy, the circumstance that the relief is asked by a party who is *particeps criminis,* is not in equity material.  The reason is that the public interest requires that the relief should be given, and it is given to the public through the party."

2. The final decree of November 10th, 1903, adjudges, concerning the deed poll of November 12th, 1900, that it "is hereby declared by this court to be against public policy [a fraud upon and unauthorized by the stockholders], inoperative, null and void."  I would prefer that the words which I have enclosed in brackets should be stricken out, or at least disapproved, in this court.  To say that the voting trust is a fraud upon the shareholders may imply fraud in fact, and I think such a finding unnecessary.  To say that it was unauthorized by the shareholders is, in my view, wholly immaterial.  The question then arises, may the words be stricken out, or at least disapproved, without reversing the decree below?  It is to be observed that the words are found in the declaratory part of the decree only.  Of this part of an equity decree it is said:  "The court frequently prefaces its decrees by declarations of matters of fact or of the rights of the parties, and then proceeds to decree the consequent

relief." See *Seton Dec. (Heard's ed.)* 7; 3 *Dan. Ch. Pr. (4th Am. ed.)* 2181, and notes. Thus, where a party establishes his right to property, the direction to transfer it to him may be prefaced by a declaration of his title (*Jenour* v. *Jenour, 10 Ves. 568*); where a partnership induced by misrepresentation is set aside, the decree may be preceded by a declaration that the deed of partnership is invalid and void and ought to be set aside (*2 Seton Dec. (4th Eng. ed.) 1194*); so, also, where an agreement is set aside for surreptitious dealings (*2 Seton Dec. 1360*). In *Panama and Southern Pacific Telegraph Co.* v. *India Rubber, Gutta Percha and Telegraph Works Co., 10 Ch. App. 515*, a decree of Vice-Chancellor Malins, wherein he had declared that "the agreement of the 12th of January, 1870, was invalid and not binding upon the plaintiffs," was affirmed, and Lord-Justice James (at *p. 528*), remarked: "Nothing would have persuaded me to give my voice for the reversal of it [the decree]. I think, however, that the form of the decree ought to be varied, and that the word 'invalid' should be left out." See, also, *Gray* v. *Blum, 10 Dick. Ch. Rep. 553, 555, 558; 2 Dan. Ch. Pr. (4th ed.) 1502.*

Making the variation in the declaration thus indicated, I am ready to vote to affirm the whole of the operative part of the decree.

The foregoing paragraph had been finished before the decree pronounced in this court was settled by the votes of many of my brethren. Upon reflection, I am satisfied that I neither sacrifice my convictions nor act unwisely in voting for the decree which sets aside the decree below and prescribes the terms of the decree to be made instead thereof. My reasons are these:

*Firstly.* The decree, as settled, is in agreement with the views which I have already expressed, in three important particulars. It adjudges the voting trust to be against public policy, inoperative, null and void; it accords to the complainants the substantial relief sought; it omits the words "a fraud upon and unauthorized by the stockholders," to which I objected. To stand aloof from so many of my associates on a matter of form, when we agree upon so much that is of substance, would, I fear, be taken as evidence of my conceit, rather than of my consistency.

Warren v. Pim.

*Secondly.* Since the decree, as settled, is, in substance, right, I wish it to be supported by as large a majority of votes as it can command in this court.

*Thirdly.* The draftsman of the original decree in the court below did not carefully distinguish the declaratory and mandatory parts of the decree by means of the appropriate introductory words, such as "this court doth declare" and "this court doth order." See *Seton Dec. (Heard's ed.) 6, 7, 611, 644; Dick. Ch. Prec. (2d ed.) 179,* and notes. The draftsman has throughout used the words "order, adjudge and decree" (see the printed case, page 694, at bottom, to page 701, at top) ; hence, although I find no difficulty in separating that part of the decree which declares from that which discerns, I concede the possibility that every reader might not agree with me; and I further concede that it is well to refrain from asserting that this court will vary a decree in its declaratory part without a technical reversal, until the case shall arise wherein the applicability of the doctrine shall be beyond denial.

At the request of three members of this court, the following questions are ordered to be voted upon separately:

*First.* Shall the final decree, entered in the court of chancery on November 10th, 1903, be set aside?

*Yes*—The Chief-Justice, Dixon, Garrison, Fort, Garretson, Swayze, Bogert, Vredenburgh, Voorhees, Green, Gray—11.

*No*—Pitney, Vroom—2.

*Second.* That decree being set aside, shall a decree be entered in its stead to the effect that J. Harold Pim, Langley Archer West and R. Montgomery Horne-Payne, known in this cause as the Pim committee, and the "Association of Foreign Shareholders of the Fisheries Company of New Jersey, Limited," assign and transfer to the several complainants the shares of stock in the "Fisheries Company," which are held by the said

committee or the said association, and are alleged in the amended bill of complaint to belong to the complainants, respectively; that the Fisheries Company cause such assignments and transfers to be regularly entered upon its proper books, and, in due course, issue proper certificates to the assignees, respectively, for the shares of stock so assigned and transferred; and that the Fisheries Company be restrained from holding any election for directors of said company until thirty days after the said certificates shall have been issued?

*Yes*—THE CHIEF-JUSTICE, DIXON, GARRISON, FORT, GARRETSON, PITNEY, SWAYZE, BOGERT, VREDENBURGH, VOORHEES, VROOM, GREEN, GRAY—13.

*No*—None.

*Third.* Shall the decree to be entered adjudge that the "voting trust," described and set forth in the pleadings in the court of chancery, is contrary to public policy, inoperative, null and void?

*Yes*—DIXON, GARRISON, PITNEY, BOGERT, VREDENBURGH, VROOM, GREEN—7.

*No*—THE CHIEF-JUSTICE, FORT, GARRETSON, SWAYZE, VOORHEES, GRAY—6.